[L.A. No. 29700. In Bank. Nov. 9, 1970.]

CITY OF LONG BEACH, Petitioner, v.
JOHN R. MANSELL, as City Manager, etc., et al., Respondents;
THE STATE OF CALIFORNIA et al., Real Parties in Interest.

## Counsel

Leonard Putnam, City Attorney, and Kenneth K. Williams, Deputy City Attorney, for Petitioner.

Keatinge & Sterling, Richard H. Keatinge, John R. McDonough and Richard N. Bates for Respondents.

Thomas C. Lynch, Attorney General, Jay L. Shavelson, Assistant Attorney General, N. Gregory Taylor, Deputy Attorney General, John D. Maharg, County Counsel, Edward A. Nugent, Deputy County Counsel, O'Melveny & Myers, Pierce Works, Thomas J. Ready, Overton, Lyman & Prince, Edmond R. Davis, Ball, Hunt, Hart & Brown, Clark Heggeness and Joseph A. Ball for Real Parties in Interest.

## OPINION

**SULLIVAN, J.**—The City of Long Beach, invoking our original jurisdiction (Cal. Const., art. VI, § 10),[1] seeks a peremptory writ of mandate commanding its city manager and city clerk to execute and put into effect certain agreements designed to resolve title and boundary problems in the Alamitos Bay area.

Alamitos Bay is located immediately north of the point where the southerly boundary of Los Angeles County meets the Pacific Ocean; it forms the mouth of the San Gabriel River. The dry land presently fronting upon the bay lies within the city limits of Long Beach and has been highly developed over the years by both private parties and public agencies; the area now comprises one of the most attractive marina-complexes in the state. Unfortunately, a combination of factors, which we describe *infra,* has cast a cloud on the title to this land to such an extent that according to the parties hereto the normal procedure of removing such a cloud, by an action to quiet title, is of no practical value.

The alternate solution undertaken in this case was a legislative act disclaiming state and other public interest in certain described lands and in certain other lands to be designated in the future, and authorizing the settlement of certain boundary questions. After several years of arduous negotiating two agreements were completed which purport to carry out the purposes of the legislation. However, the City Manager and City Clerk of Long Beach have refused to perform ministerial duties necessary to the carrying out of these agreements on the ground that they and the legislation authorizing them are in violation of constitutional and common law prohibitions against the alienation of state-owned tidelands and submerged lands. In the instant proceeding the city seeks a writ of mandate compelling the

---

[1] In making the alternative writ returnable before this court, we have necessarily determined that exercise of our original jurisdiction in this case is proper. (*County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841, 845 [59 Cal.Rptr. 609, 428 P.2d 593]; see Cal. Rules of Court, rule 56(a).)

indicated city officers to perform their ministerial duties in respect to the agreements.[2]

The parties[3] have entered into an agreed statement of facts which incorporates a volume of maps and photographs as exhibits. All parties have filed briefs in this court.

## I. Historical Summary

A short historical survey is necessary to an understanding of the issue in this case. The following represents a summary of material contained in the agreed statement of facts.

### A. Rancho Los Alamitos Title and Boundary Problems

Rancho Los Alamitos, which included the whole area here in question, was created by grant of the Spanish governor in 1784 which was confirmed by decree of the Mexican government in 1833. A claim to the rancho filed with the United States Board of Land Commissioners was confirmed by that body and by the United States District Court for the Southern District of California in 1857. Following the 1857 confirmation a government survey of the claim was made and the description emanating therefrom attempted, by reference to natural objects, to accurately delineate the bay and ocean boundaries along the then existing high tide line. However, the United States Surveyor General considered that this detailed description involved too many courses; the survey as finally approved in 1861 and 1874 reduced the number of courses and operated to exclude from the claim certain portions above the then high water mark.

Prior to the turn of the century the rancho lands bordering the bay were conveyed to members of the Bixby family and split up into various parcels which were held by members of the family and by family-owned companies. When one of these companies began to dispose of its lands it became apparent that the boundaries between private lands and public tidelands and submerged lands were by no means clear. An action to perpetuate testimony was commenced in 1903 and evidence there taken showed (1) that five portions of upland which were a part of the original rancho had been omitted from the government survey because of the reduction of the

---

[2] A fuller explanation of the events which operated to precipitate this proceeding is set forth in part IV, *infra*.

[3] Real parties in interest are (1) the State of California, acting through the State Lands Commission; (2) the Los Angeles County Flood Control District; (3) the TI Corporation, a title insurance company which insures land titles in the Alamitos Bay area; (4) Security Pacific National Bank, as trustee of a testamentary trust holding substantial private lands in the area; and (5) Macco Realty Company, a corporation holding a surface lease on the lands held by the aforementioned testamentary trust.

number of courses; and (2) that, as a result of gradual alluvial action the mouth of the bay had moved southward during the years since the original grant.

Although the proceedings to perpetuate testimony did not result in a decree quieting title, a few months after their conclusion a tract map was filed and approved covering the long peninsula north of the mouth of the bay. That map contemplated improvements on the whole of the peninsula, although apparently a portion of the peninsula was not within the rancho grant as reflected in the government survey, and another portion of the peninsula was that allegedly added by alluvial change. The peninsula was privately improved in accordance with the map.

As a result of the reduction of the number of courses in the final survey and plat of Rancho Los Alamitos, the migration southward of the mouth of Alamitos Bay and uncertainty as to the causes of such migration,[4] and other changes in the configuration of the bay which have occurred over the years, there is no agreement today among interested parties as to the original or present boundaries of the rancho and, therefore, as to the present boundaries of parcels of land whose title derives from the rancho grant.

### B. *Tidelands Patents Title and Boundary Problems*

In 1886 two members of the Bixby family received state patents to 900 acres of tidelands within the bay. Although there is no question as to the validity of the patents,[5] their original and present boundaries are uncertain for several reasons. First, the exact locations of the two monuments used in the original 1886 patent survey are in doubt. Second, it is not now known whether the 1886 survey contemplated fast (fixed) boundary lines or meander boundary lines (i.e., lines following the ordinary high and low water marks.) Third, if meander lines were intended—and the boundaries were therefore subject to alteration by accretion—it is not known whether and to what extent changes in the channels which govern low water marks have resulted from accretion rather than avulsion or the works of man. (See fn. 4, *ante.*)

---

[4]Generally speaking, the augmentation of existing upland by gradual natural *accretion* alters the boundary of that upland accordingly. When such augmentation occurs as a result of sudden *avulsion* or by accretion caused by the works of man, however, the boundary is not altered. (See Civ. Code, § 1014; *City of Los Angeles* v. *Anderson* (1929) 206 Cal. 662, 666-667 [275 P. 789]; *City of Newport Beach* v. *Fager* (1940) 39 Cal.App.2d 23, 31 [102 P.2d 438]; *Carpenter* v. *City of Santa Monica* (1944) 63 Cal.App.2d 772, 789-794 [147 P.2d 964]; 4 Tiffany, Real Property (3d ed. 1939) §§ 1219-1229, pp. 613-637.)

[5]The constitutional provision whose interpretation is central to the instant case (art. XV, § 3), which forbids the alienation of tidelands within two miles of an incorporated city, was in effect in 1886, but the tidelands in question were then more than two miles from an incorporated city. Section 7991 of the Public Resources Code, which presently forbids sale of tidelands, was not enacted until 1909.

Substantial private and public development has taken place on filled areas purporting to lie within the 1886 tideland patents. However, the present uncertainty as to the true boundaries of those patents renders all titles in the general area of the patents subject to doubt.[6]

### C. The Contribution of the San Gabriel River to Title and Boundary Problems

Of the many natural factors which over the years have brought about changes in the configuration of Alamitos Bay, the most significant is the San Gabriel River. Enormous quantities of sand, silt, and debris have been deposited in the bay by the river and these materials have been responsible for massive natural alterations in the configuration of the upland and channel. Some of the changes wrought by the river have been gradual and accretive; others have been sudden and avulsive due to flooding in particular years.

Perhaps the most dramatic change of the latter variety occurred in 1867-1868. Prior to that time the river had emptied into the ocean, along with the Rio Hondo and Los Angeles Rivers, at the present location of Los Angeles Harbor. But in the winter of 1867-1868, in the course of a tremendous flood, the river cut a new channel and emptied through Alamitos Bay. It has remained in that general channel ever since, with periodic overflows into the former channel, but other floods have resulted in less significant avulsive alterations in the channel.

As will appear below, the vast quantities of sand, silt, and debris deposited by the river in the bay have been utilized through dredging and

---

[6]The following excerpt from the agreed statement of facts indicates the practical dimensions of the problem: "Within the Alamitos Bay Area, a total of approximately 276 improved parcels (18.6 acres) of real property fall outside of the State's recent reconstruction of the survey lines recited in the Tidelands Patents. Many more parcels would be outside the Tideland Patents boundaries, if instead of regarding the survey lines as fast lines, the actual tide lines of the sloughs were used as boundaries. Claims made on various bases of the aforementioned groupings of parcels would be involved in any extensive litigation concerning the boundaries of the Tideland Patents. For example, if the slough boundary lines were taken to be as shown on [one of the maps before us as an exhibit], an additional 226 parcels (21.3 acres) fall outside the Tideland Patents and thus within the City Trust Grant, making a total of 502 parcels (39.9 acres) in all. The market value of these 502 parcels as presently improved is approximately $19,199,632.00. If other lines, as shown on [the map] were taken as the boundaries of the Tideland Patents, an even larger number of additional parcels would fall outside the Tideland Patents and the total number of parcels would exceed 502 substantially. But this is only a part of the picture. Arguments over location adjustments to said surveys and relating to the precise location of former slough areas within the Tideland Patents areas, as well as problems concerning lands included within the Rancho, could affect virtually all of the Alamitos Bay Area having a population of 19,000."

filling for the creation of presently developed areas. However, even this process was insufficient to deal with constantly increasing deposits and it was not until 1954, when the Los Angeles County Flood Control District constructed jetties separating the river channel from the bay, that the problem of continued deposits was solved.

At the present time it is practically impossible to determine which of the physical changes in Alamitos Bay due to the action of the river have resulted from accretive deposits in time of normal rainfall and which have resulted from avulsive deposits made during flood periods. Moreover, it is not possible with respect to certain filled areas to determine the extent to which natural as opposed to artificial means are responsible for the fill. The parties have concluded that the resulting title and boundary problems are insoluble.

### D. *The Contribution of the Works of Man to Title and Boundary Problems*

No attempt will be made here to offer a comprehensive discussion of the many and varied physical changes which the works of man, private and public, have wrought in the Alamitos Bay area.

As to private development, it suffices to say that very considerable dredging and filling activities over the years have operated to reclaim great areas of former tidelands, and a highly developed residential and recreational area has resulted. With one important exception, to be discussed in the next paragraph, substantially all of this activity was based upon titles purporting to derive from the 1886 Bixby tideland patents and took place within the approximate record boundaries of those patents.

The exception to which we have referred is an area known as Steamshovel Channel. In its natural state this "channel" was a narrow slough extending in a general northerly direction from the main part of Alamitos Bay, and it was specifically excluded from the 1886 Bixby tideland patents. However, in the early part of this century the upland and tidelands on the north side of the bay began to be developed, and in 1923-1924 a private developer— with all necessary government approval—filled Steamshovel Channel and the tidelands surrounding it. Nevertheless, when in 1924 the public tidelands in the area were conveyed to the city as a part of the state tidelands trust grant,[7] Steamshovel Channel was included in that grant. However, no

---

[7]The 1925 trust grant—which conveyed to the city all sovereign lands within the city limits in trust for purposes of commerce, navigation, fisheries, and related public purposes—contained *no metes and bounds description* of the lands conveyed. The

conflict was apparently perceived; the developer proceeded to sell lots on the filled area including Steamshovel Channel and residential development ensued.

Neither the city nor the state has at any time protested against the present residential use and occupation of the 8.7 acres of land filled over what was once Steamshovel Channel. The present residents of the area acquired their lands in good faith and have paid taxes on them for many years. The precise location of Steamshovel Channel before filling is now unknown and, according to the agreed statements of facts, "any claims that might be made by the State or City to parcels in the Steamshovel Channel area on the ground that they are City Trust Grant lands would be stoutly resisted and would encounter conflicting factual contentions resulting in protracted and expensive litigation involving thousands of property owners."

As in the case of private development, public improvements were constructed over the years without any resolution of title and boundary problems —despite an awareness on the part of some officials that such problems might well exist. Although most of the private filling of what are today the settled and subdivided portions of the area was completed at the time of annexation to the city (1923), the completion and continuance of such development was encouraged by the city after annexation while the city concurrently continued its plans for development of the bay. In 1925 work commenced on Marine Stadium, an area on the eastern side of the bay designed for various aquatic competitions, and that facility was completed in time for the 1932 Olympic Games. The construction of Marine Stadium and other related facilities involved substantial dredging and filling operations.

In the late 1920's oil was discovered in an area north of Marine Stadium, and the question of ownership claims in that area arose. The city council requested the city attorney to investigate the status of titles in this area, but the matter was dropped when the city attorney rendered a report which represented that the investigation had given rise to considerable uneasiness among property owners in the subject area and sales of property had been affected; that a quiet title action to determine the boundaries of the Bixby patents in the area would call into question many titles within and without the area under investigation; and that the city had little to gain from such a proceeding.

---

operative language simply granted to the city, in trust, ". . . all of the right, title and interest of the State of California . . . in and to all of the tidelands and submerged lands . . . within the corporate limits of said city, . . ." (Stats. 1925, ch. 102.)

The trust uses authorized under the 1925 grant and prior trust grant (Stats. 1911, ch. 676) were somewhat expanded by a subsequent statute. (Stats. 1935, ch. 158.)

Since the date of annexation the city has engaged in dredging to maintain existing channels in the bay. Dredged materials have been used by the city to create and maintain public beaches as well as to construct and maintain various bulkheads around the bay. Beginning in 1954 the city commenced an extensive program of improvement which has resulted in vast marina and boating facilities and has involved the expenditure of more than ten million dollars in tideland oil funds.

## II. Legislative Action

In 1957 the Legislature, being apprised of title and boundary problems in the Long Beach area, directed the State Lands Commission to survey, monument, and plat the boundaries of the tide and submerged lands granted to the city in trust (see fn. 7, *ante*), and to bring any actions necessary to determine such boundaries. (Stats. 1957, ch. 2000.) The Attorney General, acting on behalf of the State Lands Commission, immediately commenced an action to determine such boundaries within the area of Long Beach Harbor—which lies north of the Alamitos Bay area. (People v. City of Long Beach et al., Los Angeles Superior Court Civil No. 747562.) After seven years of litigation the affected boundary was settled as between the city and the state by legislation. (Stats. 1964, First Ex. Sess., ch. 138, § 7.)

In 1965, after settlement of the Long Beach Harbor tideland boundary, the city and state commenced a joint boundary investigation in order to complete the work required by the 1957 legislation. This investigation disclosed the problems which we have reviewed in part I of this opinion; it was determined that these problems were not susceptible of practical solution by litigation and that some other means was required. The means selected was that of agreements which would (1) settle the boundaries of public trust lands, (2) quitclaim public claims in subdivided and settled areas, and (3) exchange certain trust lands for certain nearby private lands.

Because the city lacked the authority to enter into such agreements and the State Lands Commission lacked the power to approve them, legislative assistance was necessary to the consummation of the plan. Such assistance was sought, and in 1965 the Legislature enacted chapter 1688 (Stats. 1965, ch. 1688) which is set forth in Appendix A attached to this opinion.

In section 2(a) of the act the Legislature found and determined that certain described lands within the Alamitos Bay area[8] "lie above the line of mean high tide, are no longer necessary or useful for commerce, fisheries

---

[8]Section 1 of the act described the "Alamitos Bay area" by metes and bounds. The area thus described comprises some 2.6 square miles and has a population of approximately 19,000 persons.

and navigation and are hereby freed from the public use and trust for commerce, fisheries and navigation to the extent such may have existed as to any of said lands." Generally speaking, the described lands are the settled and subdivided portions of the Alamitos Bay area.

In section 2(b) of the act it was found and determined that portions of the Alamitos Bay area other than and in addition to those described in section 2(a) "have been heretofore improved in connection with the development of the Alamitos Bay area, and in the process of said development have been filled and reclaimed, are no longer submerged or below the line of mean high tide and are no longer necessary or useful for commerce, fisheries or navigation." The section went on to direct the State Lands Commission to determine the location of such lands and record a description thereof together with a certificate declaring such lands to be no longer necessary or useful for commerce, fisheries, or navigation—whereupon such lands were to be freed from the public trust for these purposes.

In section 3(a) the city was authorized to convey, release, or quitclaim its interest in section 2(a) lands to (1) persons holding such lands under a record claim of title of 30 years or more or (2) persons who, although not holding under a 30-year claim of title, had paid taxes for more than 30 years on the property. In section 3(b) the city was authorized to convey, release or quitclaim any portion of section 2(b) lands as to which a certificate of nonutility for trust purposes had been filed by the State Lands Commission to persons designated by preference in the section. In section 3(c) the city was authorized, with the approval of the State Lands Commission, to settle by agreement, exchange, or quitclaim any dispute as to whether particular lands were proprietary lands or public tidelands held in trust by the city.

In section 4 of the act it was provided that consideration to be paid for any conveyance, release, quitclaim, or settlement was to be determined by the city with the approval of the State Lands Commission.

Section 5 provided that any tidelands conveyed under the terms of the act should pass free of the tidelands trust; that no lands below the mean high tide line should be conveyed; that the certificate of the State Lands Commission as to nonutility for trust purposes should be conclusive; and that mineral rights should be reserved in all but section 2(a) lands.

Section 6 provided for the execution of relevant documents.

Section 7 provided that all consideration received for conveyances should be held as a part of the city's tideland trust.

Section 8 provided in general that the provisions of the act were not the

exclusive means of settlement of title and boundaries and that other (i.e., judicial) means remained available.

Section 9 was a severability clause.

## III. The Agreements

Following the enactment of chapter 1688 the parties to this proceeding, as well as other parties affected, commenced negotiations which continued for more than three years and which resulted in the two subject agreements, whose general object is to provide a means for settling the title and boundary problems in the area without requiring judicial resolution of the myriad factual issues involved.[9]

### A. The Belmont Shore-Naples Boundary Settlement (Belmont Agreement)

The primary purpose of this agreement is to settle, or provide a means for settling, the title problems affecting the thousands of persons who live in the settled and subdivided portions of the Alamitos Bay area which were described in section 2(a) of chapter 1688. The source of these problems is the fact that the city has a substantial claim, based upon the 1925 trust grant (see fn. 7, ante), of paramount legal title to all or part of at least 502 parcels in the section 2(a) area. The claims of the homeowners on the other hand—with the important exception of Steamshovel Channel—are based upon the original Rancho Los Alamitos grant and the 1886 Bixby tideland patents. As indicated above, the settlement of these conflicting claims through litigation would—it is alleged—be practically impossible.

A second but related major purpose of the Belmont agreement is to effect the settlement of various boundaries in the section 2(a) area between public tidelands and private tidelands or former tidelands. This aspect of the agreement, which will be explained in greater detail below, has importance relative to private properties which lie at or near the border of tidelands which are to remain public according to the agreement.

In general the Belmont agreement provides that the city and state, in exchange for a contribution of $783,500 to be paid into the city's tide-

---

[9]Each of the two agreements originally provided that unless it became effective on or before December 31, 1969, it would be of no further force or effect. The instant proceeding was initiated on November 30, 1969, and on or about July 13, 1970, all petitioners amended the agreements to substitute December 31, 1972, as the termination date. The record has been augmented to reflect these amendments, and all parties have stipulated that the matter shall be decided as if the agreements "had provided originally, as they now do after amendment, for a termination date of December 31, 1972."

land trust fund by the TI Corporation (a real party in interest), will execute a series of conveyances, disclaimers of interest, and boundary agreements—the net effect of which (assuming execution of boundary agreements by other interested parties) will be to settle and fix titles and boundaries in the section 2(a) area in conformity with the claims of present record owners.

As to the settled and subdivided portions of section 2(a) lands the Belmont agreement will have two effects. *First,* the city and state will relinquish, with a few exceptions, all claims that they or either of them might assert on the basis that such lands are public tidelands or submerged lands by virtue of the 1925 trust grant.[10] This aspect of the agreement will solve title and boundary problems relating to all properties within the section 2(a) area *except* those properties which lie at or near the border of the section 2(a) area.

The *second* effect of the agreement will relate to certain of these border properties. The city and state will execute four boundary agreements which would fix the boundary between certain border and public lands at the limit of the section 2(a) area. These supplementary boundary agreements, of course, would not become effective until executed by the respective border owners. Thus, a border owner who was satisfied with the section 2(a) line as his boundary would execute the agreement and thereby fix the boundary; a border owner who was not so satisfied could refuse to execute the agreement and seek to determine the true boundary by other means. This arrangement is consistent with the provisions of section 8 of chapter 1688.

The Belmont agreement will also disclaim public interest relative to certain section 2(b) lands which were among those high and dry lands which were apparently inadvertently omitted from the official plat of the original rancho grant (1874).

### B. *The McGrath-Macco Boundary Settlement and Exchange (McGrath Agreement)*

This agreement deals with undeveloped section 2(b) lands which lie immediately north of and abut upon Marine Stadium. The parcels were formed for the most part by filling which was the result of dredging Marine Stadium.

Major parties to the McGrath agreement, are, on the one hand, the city

---

[10]This will be accompanied by means of two quitclaim documents, one by the city and one by the state, in favor of those persons, specified in section 3(a) of chapter 1688, whose respective claims are based upon a record claim of title, or the payment of taxes, or both, for more than 30 years.

and the state; and on the other hand, the McGrath Testamentary Trust (record owner of lands in the subject area), Macco Realty Company (lessee of McGrath lands) and Security Pacific National Bank (trustee of the McGrath trust).

There are four main aspects to the McGrath agreement. *First,* the boundaries between state lands and McGrath lands are to be settled and fixed according to a 1966 state survey. *Second,* certain state lands having an aggregate area of 5 acres are to be exchanged for certain McGrath lands having an aggregate area of 8.5 acres which abut either water or existing public trust facilities and are of such a configuration that they can be used more effectively by the city and state in furtherance of public trust purposes. *Third,* the expenditure of $1,285,895 from the city's tideland trust fund is to be authorized to construct certain park and marina facilities. *Fourth,* a right of way is to be granted to the Los Angeles County Flood Control District.

## IV. Operative Facts Leading to this Proceeding

By separate resolutions dated August 27, 1968 (corrected in certain details by an amending resolution dated October 29, 1968) the Long Beach City Council approved the two agreements, directed the city clerk to post the resolutions as required by the city charter, and directed the city manager to execute the agreements on behalf of the city.

On August 28, 1968, the State Lands Commission, acting on behalf of itself and the state and pursuant to chapter 1688 and its general powers under the Public Resources Code, executed the two agreements. On September 9, 1968, the Governor executed the agreements.

On September 6, 1968, the city manager directed to the mayor and city council a letter in which he (1) stated his recognition that each of the two subject agreements would result in great benefit to the public and to the tideland trust, but (2) respectfully declined to execute the agreements on the following grounds: "I have been advised that there exist serious questions of law regarding the constitutionality of the statu[t]es authorizing the City to enter into these agreements, particularly Chapter 1688, Statutes of 1965, and additional serious questions regarding the legality of both agreements and of the form of quitclaim to be executed by the City pursuant to the Belmont Shore-Naples Boundary Settlement." On the same date the city clerk sent a similar letter respectfully declining to post the approving resolutions for the reasons expressed by the city manager. (See fn. 2, *ante.*)

In this proceeding the city seeks a peremptory writ of mandate to require the respondents city manager and city clerk to perform the ministerial duties

which they refuse to perform.[11] By granting the alternative writ we have determined the absence of an adequate remedy in the ordinary course of law. (*County of Sacramento* v. *Hickman, supra,* 66 Cal.2d 841, 845.)

*V. The Legal Problem: The Application of Muchenberger and Atwood*

Article XV, section 3, of the California Constitution, which became effective in 1879, provides as here relevant: "All tidelands within two miles of any incorporated city, city and county, or town in this State, and fronting on the water of any harbor, estuary, bay, or inlet used for the purposes of navigation, shall be withheld from grant or sale to private persons, partnerships, or corporations; . . ."

All of the lands involved in this proceeding lie within the city limits of Long Beach.

The central question in this case, simply stated, is whether chapter 1688 and the two proposed agreements prepared in furtherance of it are in violation of article XV, section 3.[12]

Crucial to the determination of this question is the meaning to be attached to the word "tidelands" in article XV, section 3. Petitioners contend that the word denotes lands which are in fact seaward of the line of mean high tide[13] *at the time of the intended conveyance or transfer.* Respondents contend that the word denotes lands which were seaward of the mean high tide line *when the Alamitos Bay last existed in a state of nature* or, at least, *when the 1879 Constitution was adopted.*

We are persuaded that the interpretation urged by respondents is the correct one. The spirited debates which preceded the adoption of article XV, section 3, by the Constitutional Convention manifest clearly that the matter at issue was whether tidelands then remaining in public ownership should suffer the undesirable consequences which had resulted from the prior practice of granting tidelands in a harbor into private, and often monopolistic, ownership. (Debates and Proceedings, California Constitutional Con-

---

[11]"The writ of mandate lies to compel the performance of a clear, present, and ministerial duty 'which the law specifically enjoins.' (Code Civ. Proc., § 1085.)" (*County of Sacramento* v. *Hickman, supra,* 66 Cal.2d 841, 845.)

[12]In a later portion of this opinion we explain the relationship between this central question and related matters concerning the common law public trust to which all tidelands are subject.

[13]Tidelands are properly those lands lying between the lines of mean high tide and mean low tide. Lands seaward of the line of mean low tide are properly submerged lands. (See generally 1 Shalowitz, Shore and Sea Boundaries (1962) Appendix A, pp. 316, 318.) For purposes of convenience, the parties have referred to both of these kinds of lands as "tidelands."

vention 1878-1879, pp. 1038-1039, 1478-1481.)[14] The provision adopted after these debates was clearly designed to insure that similar legislative grants would not occur in the future and that the then-existing public tidelands would remain in public ownership in order to better serve the public interest. It would be contrary to the spirit and purpose of article XV, section 3, to conclude that the word "tidelands" as used therein denotes only those public lands which retain the physical characteristics of tidelands at the time of proposed alienation, for such a construction would permit parties to remove public tidelands from the reach of the constitutional provision by simply filling so that such lands were no longer covered and uncovered by the flow and ebb of the tide. It is clear that the framers did not intend to establish a prohibition which could be so easily avoided. We therefore conclude that the word "tidelands" as used in article XV, section 3, denotes lands which were seaward of the mean high tide line when the provision was adopted in 1879.[15] It does not automatically follow, however, that because the lands here in question fall within the indicated category, chapter 1688 and the two agreements must fall. Several decisions of this court interpreting the constitutional provision remain to be considered.

In the case of *Muchenberger* v. *City of Santa Monica* (1929) 206 Cal. 635 [275 P. 803], the city, as trustee of state tidelands fronting upon its Pacific Ocean boundary, and the Santa Monica Land Company, which held private lands extending westerly to the mean high tide line, determined to fix the said mean high tide line in order to settle the boundary between their respective lands. "This line was arrived at by means of readings taken by the surveyor at stations located 500 feet apart, and checking with other surveys. It was based on the fixed datum plans established by the United States Coast and Geodetic Survey, and the line was made straight in an endeavor to attain the average of a mean high-tide line. While the line . . . did not exactly coincide with the mean high-tide line as it varied from day to day, the trial court [found] that it [was] a fair average line . . . and, as established, it [was] for the best interests of the city that the same 'be upheld and maintained.' The mean high-tide line thus located was accepted by the city and by the land company as fixing and making definite and certain the boundary line between the tidelands of the city and the property of the land company, and for the purpose of protecting the city against any claims which might thereafter be made, or which might other-

[14]Illustrative excerpts from these debates, showing the views of delegates on both sides of the issue, are set forth in Appendix B attached to this opinion.

[15]The facts of this case do not require that we consider respondents' alternative contention that the word "tidelands" as used in article XV, section 3, denotes those lands which were subject to the ebb and flow of the tide "as they last existed in a state of nature."

wise be made by the land company or its successors, that it or they had acquired title by accretion to any land which might be subsequently built up. . . ." (206 Cal. at p. 640.)

The city and the land company executed an agreement fixing this line and a joint quitclaim deed. Certain taxpayers in the city sought to enjoin this arrangement as violative of article XV, section 3, but this court held that there was no violation. "It was not the purpose of the city in this case to transfer any titles, but to mark the boundaries of littoral holdings in order to make them certain and permanent and to prevent questions arising in the future concerning the ownership of lands on either side of the line agreed upon. The purpose and scope of the quitclaim deed plainly appear from the recitals and terms of the instrument. Neither party purports to grant any property or interest to the other. The trial court found that, although an instrument in the form of a quitclaim deed was adopted by the parties, the substance of the transaction was merely an agreement upon an uncertain boundary, and that the deed was made only for the purpose 'of fixing and definitely establishing a boundary line which was theretofore uncertain and in doubt and that the said quitclaim deed did not convey any property whatever.' That being the fact, the transaction appears to fall within the language used in *Loustalot* v. *McKeel,* 157 Cal. 634, 643 . . . where the court said: 'They [agreements of this character] do not operate as a conveyance so as to pass title from one to another, but they proceed upon the theory that the true line of separation is in dispute and to some extent unknown, and in such cases the agreement serves to fix the line to which the title of each extends.' " (206 Cal. at p. 645.)

■ We reaffirm our holding in *Muchenberger,* which we summarize as follows: When the boundary between public trust tidelands and private uplands is uncertain, and the parties, wishing to fix the boundary in order to prevent future questions of ownership, undertake genuine efforts to determine the true boundary and thereafter agree to a line which fairly represents these efforts, then the subsequent formal "conveyance" in the form of a quitclaim deed by the trustee in furtherance of the boundary agreement does not evidence a "grant or sale" of public tidelands within the meaning of article XV, section 3, of the state Constitution. This principle is wholly consistent with the meaning and purpose of the constitutional provision, for it simply permits the state and its trustee to undertake genuine efforts to determine the extent and true boundaries of public tidelands and to settle such boundaries in fair accordance with the findings resulting from those efforts. (See also *City of Los Angeles* v. *Borax Consolidated Ltd.* (9th Cir. 1939) 102 F.2d 52, 56-57.)

■ It is clear that the principle of *Muchenberger* v. *City of Santa*

*Monica* operates to render certain portions of the two agreements free from objection on the constitutional ground in question. Thus, it appears that the rationale of *Muchenberger* is applicable to those portions of the Belmont and McGrath agreements which are true boundary settlements, i.e., which represent genuine efforts on the part of the parties to locate rancho and Bixby patent boundaries in their true positions. An example is that portion of the McGrath agreement which fixes the boundary between state and McGrath lands according to a 1966 state survey. (McGrath agreement, art. 4.) Another example is that portion of the Belmont agreement which disclaims public interest (and therefore in essence fixes a new boundary) with regard to certain section 2(b) lands which were apparently omitted due to inadvertence from the official plat of the original rancho grant. (See text preceding fn. 4.) (Belmont agreement, art. 8.)

Petitioners contend, however, that the principle of *Muchenberger* should be given a much broader application. Thus, they urge that that principle should operate to remove constitutional objections to the main portion of the Belmont agreement—which essentially quiets title in record owners of all improved lands within the area described in section 2(a) of chapter 1688. The city's quitclaim in this instance, they argue, should be viewed not as a "grant or sale" in violation of article XV, section 3, but rather as a mechanism by which existing private claims are recognized as valid.

It is clear, however, that the suggested application of the *Muchenberger* principle stretches the rationale of that case far beyond its intended scope and would have the practical effect of reading article XV, section 3, out of the Constitution. The indicated portion of the Belmont agreement certainly does not represent a bona fide effort to establish the *true* boundary between state and proprietary lands; rather it represents an arrangement whereby the boundary is drawn in such a way as to accommodate the homeowners in question *regardless* of where the true boundary line might be. It is therefore very difficult indeed to conclude that no "grant or sale" results as to the bulk of the section 2(a) lands. It is plainly impossible to so conclude as to the lands (8.7 acres) now covering what once was Steamshovel Channel, for these lands are indisputedly public tidelands.

Petitioners also contend, on the basis of certain early decisions of this court, that the Legislature has the power to terminate the common law public trust as to tidelands which have ceased to be necessary or useful for purposes of navigation, commerce, and fisheries—and that tidelands so freed from the public trust may be alienated without violation of article XV, section 3. Apparently this argument accepts respondents' contention that "tidelands" within the meaning of article XV, section 3, are lands which were seaward of mean high tide in 1879 (see text preceding fn. 15, *ante*)

but urges that such lands can be removed from the crucial category by legislative declaration.

■ An understanding of this argument requires a brief explanation of the common law trust[16] as it relates to questions of alienation. The state's "ownership" of public tidelands and submerged lands (see Civ. Code, § 670), which it assumed upon admission to the Union, is not of a proprietary nature. Rather, the state holds such lands in trust for public purposes, which have traditionally been delineated in terms of navigation, commerce, and fisheries. The powers of the state as trustee are implied and include everything necessary to the proper administration of the trust in view of its purposes—with certain express reservations such as article XV, section 3.[17]

■ Although these powers include disposal of trust lands in such manner as the interests of navigation, commerce, and fisheries require, tidelands subject to the trust may not be alienated into absolute private ownership; attempted alienation of such tidelands passes only bare legal title, the lands remaining subject to the public easement.[18] However, the state in its proper administration of the trust may find it necessary or advisable to cut off certain tidelands from water access and render them useless for trust purposes. In such a case the state through the Legislature may find and determine that such lands are no longer useful for trust purposes and free them from the trust. When tidelands have been so freed from the trust—and if they are not subject to the constitutional prohibition forbidding alienation—they may be irrevocably conveyed into absolute private ownership.

The common law public trust here described is to be distinguished from the constitutional prohibition set forth in article XV, section 3. The former does not of itself forbid the alienation of tidelands but merely insures that when such lands are subject to the trust (i.e., have not been removed therefrom by proper legislative determination), they remain so subject even after alienation. The constitutional provision, on the other hand, flatly forbids alienation of certain tidelands—i.e., tidelands within two miles of an incorporated city—*whether or not* they are trust lands at the time of alienation.

---

[16]A comprehensive explanation of the common law trust is to be found in *People* v. *California Fish Co.* (1913) 166 Cal. 576, 583-603 [138 P. 79], and need not be repeated here.

[17]The administration of the trust by the state is committed to the Legislature, and a determination of that branch of government made within the scope of its powers is conclusive in the absence of clear evidence that its effect will be to impair the power of succeeding legislatures to administer the trust in a manner consistent with its broad purposes. (See *Mallon* v. *City of Long Beach* (1955) 44 Cal.2d 199, 207 [282 P.2d 481], and cases there cited.)

[18]Conveyances of this nature have been forbidden by statute since 1909 (Pub. Resources Code, § 7991) but were allowed prior to that time.

The cases upon which petitioners rely (*Atwood* v. *Hammond* (1935) 4 Cal.2d 31 [48 P.2d 20]; *People* v. *Kerber* (1908) 152 Cal. 731 [93 P. 878]; *Boone* v. *Kingsbury* (1928) 206 Cal. 148 [273 P.797]; see also *City of Milwaukee* v. *State* (1927) 193 Wis. 423 [214 N.W. 820, 54 A.L.R. 419]) indicate that this distinction can be made to yield in some circumstances. Thus, in *Atwood* v. *Hammond, supra,* 4 Cal.2d 31, the defendant city and county proposed to establish a civic center upon tidelands which had been conveyed to it for that purpose by the state. Plaintiff taxpayers contended that such a use was not permissible because the subject tract was part of a larger tract previously conveyed to the city subject to the public trust for navigation, commerce, and fisheries. This court held that the demurrer to the complaint was properly sustained without leave to amend.

We pointed out that a prior grant to the city for trust purposes was made upon condition that the city undertake harbor improvements on the granted property, and that in the course of making such improvements dredging occurred and the subject tract was filled with the resulting sand and debris, and a bulkhead was erected. Subsequent grants made after the subject tract had been reclaimed (1) declared that the tract had ceased to be tidelands and was free from the trusts and restrictions imposed by the prior grant and (2) conveyed the reclaimed land to the city for municipal purposes including that of a civic center. We held that, whereas the reclamation itself "did not *ipso facto* terminate the public trust for navigation and commerce . . . ," nevertheless "it was competent for the state by legislative action [i.e., the subsequent grant] to terminate the public trust as to the eighteen-acre parcel, which constitutes but a small part of the area granted to the city." (4 Cal.2d at p. 41.)

After this conclusion that it was permissible for the state to terminate the common law trust as to the reclaimed parcel, we turned to a consideration of the effect of constitutional provisions. We first pointed out that "there has been no attempt to alienate the eighteen-acre parcel which is the subject of this action from public ownership, but, rather, an effort to require that it be used only for purposes not connected directly with navigation or commerce, that is, for county and municipal buildings." (4 Cal.2d at p. 42.) This fact, however, did not render relevant constitutional provisions wholly unworthy of consideration. "[I]n view of the manifest purpose of sections 2[19] and 3, article XV, the prohibition against alienation necessarily implies a prohibition against freeing such tidelands from the trust for navigation and

---

[19]Section 2 of article XV provides: "No individual, partnership, or corporation, claiming or possessing the frontage or tidal lands of a harbor, bay, inlet, estuary, or other navigable waters in this State, shall be permitted to exclude the right of way to such water whenever it is required for any public purpose, nor to destroy or

dedicating them to other uses while they remain tidelands. But said section cannot be interpreted to forbid the reclamation of lands which may be filled in as the result of a highly beneficial program of harbor development. It applies to tidelands, that is, to lands covered and uncovered by the flow and ebb of the tides, and, it has been held, to lands which are continuously submerged. It does not in terms apply to lands which, through reclamation, are no longer covered and uncovered by the tides, and have ceased to be tidelands. We are of the view that it was competent for the legislature upon finding that the eighteen-acre tract was 'not longer required for navigation, commerce or fisheries,' to free it from the public easement for those purposes." (4 Cal.2d at pp. 42-43.)

Finally, we emphasized that only a small portion of the original trust grant was being freed from the public trust. "Plaintiff does not allege what proportion of the total area lying shoreward of the bulkhead line or seawall this eighteen-acre parcel constitutes. But the inference is that it is only a very small part of the total acreage. . . . We cannot interfere with the legislature's decision that the public easement may be abrogated as to this relatively small parcel." (4 Cal.2d at p. 43.)

The parties are in substantial dispute as to the meaning and application of this case. As indicated above, petitioners find support therein for their contention that the prohibition of article XV, section 3, is inapplicable to tidelands which have been reclaimed "as the result of a highly beneficial program of harbor development" (4 Cal.2d at p. 42) and have been declared by the Legislature to be no longer subject to the common law trust. Respondents, on the other hand, point out that the lands in *Atwood* were granted to a *public* rather than a *private* grantee so that, as the court recognized, the constitutional provisions were strictly inapplicable for that reason. Thus, respondents argue, any support to be found for petitioners' position in the court's language must rest upon mere dictum.

However the language in *Atwood* may be characterized in terms of its value as precedent, we think that it represents a clear statement of this court that article XV, section 3, does not forbid alienation of lands within two miles of an incorporated city which have been reclaimed "as the result of a highly beneficial program of harbor development," are relatively small in area, and have been freed of the public trust by legislative act. One persuasive reason for this conclusion is that the court in *Atwood*, prior to the language above quoted, discussed and cited a number of cases involving public harbor development which entailed the granting of lands reclaimed in

obstruct the free navigation of such water; and the Legislature shall enact such laws as will give the most liberal construction to this provision, so that access to the navigable waters of this State shall be always attainable for the people thereof."

the course of development into private ownership.[20] Although these cases do not concern themselves with the application of article XV, section 3—that provision not being in existence at the time of the transfers there in question—the material which we have quoted proceeds in light of those cases and clearly indicates that article XV, section 3, would not have forbidden those transfers.

Secondly, we consider that the principle of the *Atwood* case is wholly consistent with the purposes of the framers of the Constitution. The debates at the Constitutional Convention, to which we have adverted above, reveal a general intention to retain tidelands within two miles of incorporated cities in order that such tidelands might be utilized in the public interest for navigational and related purposes rather than in the interest of private persons to whom they might be granted. Surely if in the course of, and for the purpose of carrying out, a comprehensive public program of harbor development certain portions of tidelands are filled under circumstances clearly showing that, in the light of the relatively minor area involved and the manner of reclamation in relation to the program as a whole, such reclamation is merely a reasonably necessary incident of the program and of the promotion of its public objective, and if thereafter such filled areas are declared by the Legislature to be of no value for navigational and related purposes, then we think that a sale and transfer into private ownership of such filled-in areas might be found to be entirely consistent with the intention and objective of the framers of the Constitution. But we emphasize that the circumstances under which this may occur are of necessity unique, that the conditions sanctioning its approval must be scrupulously observed and satisfied, and that generally speaking the reclaimed area alleged to be free from both the public trust and the constitutional restriction against alienation into private ownership must be, as it were, a residual product of the larger program—a "relatively small parcel" to use the language of *Atwood* (4 Cal.2d at p. 43)—determined by the Legislature to have no further value for the purposes of the public easement.

To reiterate, we conclude that when lands within two miles of an incorporated city or town which were subject to the ebb and flow of the tide at the date of the adoption of the Constitution—and which therefore are

---

[20]Among the cases cited is *Eldridge* v. *Cowell* (1854) 4 Cal. 80, which involved the development of the San Francisco waterfront. There, as the opinion related, the tidelands were filled out to deep water and the filled property (i.e., roughly speaking from Battery Street to the Embarcadero) was sold into private ownership with legislative authorization. (See also *Knudson* v. *Kearney* (1915) 171 Cal. 250, 252-253 [152 P. 541]; *Alameda Conservation Assn.* v. *City of Alameda* (1968) 264 Cal.App. 2d 284, 287 [70 Cal.Rptr. 264].)

"tidelands" within the meaning of article XV, section 3—(1) have been found and determined by the Legislature to be valueless for trust purposes and are freed from the public trust (see fn. 17, *ante*) and (2) have been or are to be reclaimed pursuant to and in the course of a highly beneficial public program of harbor development, such lands—if they constitute a relatively small parcel of the total acreage involved—thereupon cease to be "tidelands" within the meaning of the constitutional provision and are subject to alienation into absolute private ownership.[21]

It remains that we determine the application of this principle to the case before us.

 It is clear, we think, that those portions of the McGrath agreement which contemplate the exchange of certain reclaimed public tidelands for other lands owned by the McGrath trust are consistent with the principle we have enunciated. The public lands in question were reclaimed in the course of that public program of harbor development which resulted in the creation of Marine Stadium. Those lands are relatively minor in area (5 acres) and have been declared in chapter 1688 to be "no longer necessary or useful for commerce, fisheries and navigation." Moreover the exchange *itself* is sought to be made in furtherance of an existing and ongoing program of harbor development.

The situation is otherwise, however, with regard to the settled and subdivided lands described in section 2(a) of chapter 1688 which are the primary concern of the Belmont agreement. As we have indicated above, the filling of these lands by private developers began at about the turn of the century and was substantially completed when the Alamitos Bay area was annexed to the city in 1923. This filling proceeded in a rather haphazard manner, without significant regard for the uncertain boundaries in the area, and in one case—that of Steamshovel Channel (see text accompanying fn. 7, *ante*)—filling was undertaken upon lands whose public character was clear. It is manifest that the filling in question was not undertaken pursuant to and as an integral part of a public program of harbor development. Moreover, the contemplated disclaimer of public interest and quitclaim in favor of private parties is in no way related to the present public program of harbor development in the Alamitos Bay area. For these reasons it is apparent that the principle we have distilled from *Atwood* v. *Hammond, supra,* 4 Cal.2d 31, and related cases is not applicable to the section 2(a)

---

[21]That portion of *California Fish* which deals with the operation of article XV, section 3 (166 Cal. at p. 603 et seq.) is in no way inconsistent with this conclusion, for it merely demonstrates that absent the factors we have stated a patent to tidelands which lie within two miles of an incorporated city is void by virtue of article XV, section 3.

lands dealt with in the Belmont agreement. It must therefore be concluded that those lands, to the extent they are in fact public "tidelands" within the meaning of article XV, section 3, of the California Constitution, have not been withdrawn from that category by proper legislative action and remain subject to the prohibition against alienation contained in that section.

## VI. *Estoppel*

 Petitioners' final argument as to the section 2(a) lands covered by the Belmont agreement is one of estoppel. It is pointed out that the subject lands were filled and improved with the knowledge and acquiescence of the state and city and that since annexation of the area in 1923 the city has exercised full municipal jurisdiction over it—granting building permits, approving subdivision maps, constructing and maintaining streets and city services, collecting taxes. To allow the state and city after having engaged in such a course of conduct to assert a claim of paramount title would, it is urged, result in a manifest injustice to persons whose title derives from those who reasonably relied upon such conduct and were induced to act in accordance therewith, and the doctrine of equitable estoppel should be applied to prevent them from doing so.

We must first observe the peculiar context in which this contention is sought to be raised. In essence it appears that the state and city are attempting to estop *themselves* from raising a matter which, strictly speaking, *is not relevant* to the instant proceeding. The issue in this case is whether respondents shall be required to execute documents purporting to convey whatever public interest there may be in the subject lands to record owners thereof. The issue is not whether there actually exists any public interest in the subject lands, and therefore the question of whether the state and city should be prevented from asserting any such interest is not actually before us. Strictly speaking our only concern is whether, *if* the state and city have any interest in the subject lands, they may alienate that interest into private hands. The question of the actual existence and dimensions of such a public interest, and therefore the question of whether the state and city may be permitted to assert it, would properly arise only in a trial of title—and in such a proceeding arguments of estoppel would be properly advanced only by those who would be injured if paramount title were established.

In spite of these formal considerations, however, we believe that the circumstances of this case render appropriate a present consideration of the matter of estoppel. There is no doubt that a quiet title action of the scope necessary to determine the title questions pertaining to the section 2(a) lands dealt with in the Belmont agreement would be a massive undertaking. Clearly the interests of sound judicial administration suggest that

those who would be parties to such an action should be spared that undertaking if it appears, as a matter of law and on the basis of facts stipulated to by the parties who would there assert paramount title, that such assertion would be precluded by the doctrine of equitable estoppel. (See *California Cigarette Concessions* v. *City of L. A.* (1960) 53 Cal.2d 865, 868 [3 Cal. Rptr. 675, 350 P.2d 715]; *Ware Supply Co.* v. *Sacramento Savings & L. Assn.* (1966) 246 Cal.App.2d 398, 407-408 [54 Cal.Rptr. 674].) To hold otherwise and, on purely formalistic grounds, to perversely turn our backs on equitable considerations which we could not ignore had they been molded in the ordinary matrix of quiet title actions, would be to annihilate the basic concept of chapter 1688 that some solution other than massive litigation is required for the instant title problems. We therefore proceed to consider the application of that doctrine in the instant proceeding.

█ The venerable doctrine of equitable estoppel or estoppel in pais, which rests firmly upon a foundation of conscience and fair dealing,[22] finds its classical statement in the words of Lord Denman: "[T]he rule of law is clear, that, where one by his words or conduct wilfully causes another to believe the existence of a certain state of things, and induces him to act on that belief, so as to alter his own previous position, the former is concluded from averring against the latter a different state of things as existing at the same time; . . ." (*Pickard* v. *Sears & Barrett* (K.B. 1837) 6 Ad. & Ell. 469, 474.) Long established in the judicial decisions of this state, the doctrine was perhaps most aptly expressed by this court in *Seymour* v. *Oelrichs* (1909) 156 Cal. 782 [106 P. 88], where, quoting from an early decision of the United States Supreme Court, we stated: " 'The vital principle is that he who by his language or conduct leads another to do what he would not otherwise have done shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is sternly forbidden. It involves fraud and falsehood, and the law abhors both.' " (156 Cal. at p. 795.)

A similar statement of the doctrine has appeared in the statutes of California since 1872 (former Code Civ. Proc., § 1962, subd. 3), and section 623 of the Evidence Code now provides: "Whenever a party has, by his own

---

[22]Professor Pomeroy emphasizes the broad equitable concepts underlying the doctrine in the following terms: "Equitable estoppel in the modern sense arises from the *conduct* of a party, using that word in its broadest meaning as including his spoken or written words, his positive acts, and his silence or negative omission to do anything. Its foundation is justice and good conscience. Its object is to prevent the unconscientious and inequitable assertion or enforcement of claims or rights which might have existed or been enforceable by other rules of the law, unless prevented by the estoppel; and its practical effect is, from motives of equity and fair dealing, to create and vest opposing rights in the party who obtains the benefit of the estoppel." (3 Pomeroy, Equity Jurisprudence (5th ed. 1941) § 802, p. 180, fns. omitted.)

statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it."

As we pointed out in the recent case of *Driscoll* v. *City of Los Angeles* (1967) 67 Cal.2d 297, at p. 305 [61 Cal.Rptr. 661, 431 P.2d 245], "Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." Keeping in mind the admitted generality of this formulation and the flexibility which is necessary to its proper concrete application within the broad equitable framework we have expressed, it may be said that the elements here stated are basic to the general doctrine of equitable estoppel as it exists in this and other jurisdictions. (See generally 3 Pomeroy, Equity Jurisprudence (5th ed. 1941) § 805, pp. 190-198; 28 Am.Jur.2d, Estoppel and Waiver § 35, pp. 640-642; 31 C.J.S., Estoppel § 67, pp. 402-415.)

Although generally speaking it is true that the application of the doctrine of equitable estoppel to controversies centered upon title to land involves the same basic factors of the doctrine as are brought into play in other areas of the law, the courts in California and other jurisdictions have proceeded with considerable caution and restraint when the effect of raising an estoppel would be to take the title to land from one person and vest it in another, for such a result would be essentially contrary to the intent and purpose, if not the letter, of the statute of frauds. (See *Biddle Boggs* v. *Merced Mining Co.* (1859) 14 Cal. 279, 367; *Davis* v. *Davis* (1864) 26 Cal. 23, 41, quoted in Code Commissioners' Notes (1872) to former Code Civ. Proc., § 1962, subd. 3; *City of San Diego* v. *Cuyamaca Water Co.* (1930) 209 Cal. 105, 142-143 [287 P. 475]; *Taliaferro* v. *Colasso* (1956) 139 Cal.App.2d 903, 907-908 [294 P.2d 774]; *Marks* v. *Bunker* (1958) 165 Cal.App.2d 695, 700 [332 P.2d 340]; 4 Witkin, Summary of Cal. Law (7th ed. 1960) Equity, § 95, pp. 2872-2873; 3 Pomeroy, Equity Jurisprudence (5th ed. 1941), §§ 807, 821, pp. 201-204, 258; 28 Am.Jur.2d, Estoppel and Waiver, § 81, pp. 723-726; 31 C.J.S., Estoppel, § 150, pp. 738-741.) Thus it has been held that the doctrine will not be applied to divest title to land in the absence of actual or constructive fraud on the part of the party to be estopped. (See authorities cited immediately, *supra*.)[23] In Cali-

---

[23]"While the owner of land may by his acts *in pais* preclude himself from asserting his legal title, 'it is obvious that the doctrine should be carefully and sparingly applied, and only on the disclosure of clear and satisfactory grounds of justice and equity. *It is opposed to the letter of the statute of frauds,* and it would greatly tend to the

fornia this additional aspect is reflected in the often quoted language of Chief Justice Field in the leading case of *Biddle Boggs* v. *Merced Mining Co., supra,* 14 Cal. 279, at pages 367-368: "[T]o the application of this principle [of equitable estoppel] with respect to the title of property, it must appear, *first,* that the party making the admission by his declarations or conduct, was apprised of the true state of his own title; *second,* that he made the admission with the express intention to deceive, or with such careless and culpable negligence as to amount to constructive fraud; *third,* that the other party was not only destitute of all knowledge of the true state of the title, but of the means of acquiring such knowledge, and, *fourth,* that he relied directly upon such admission, and will be injured by allowing its truth to be disproved."

The central requirement of *Biddle Boggs* that there be conduct tantamont to actual or constructive fraud on the part of the party to be estopped before the doctrine of equitable estoppel will be applied in questions of land title[24] has been consistently recognized and upheld in this state. (See, in addition to cases above cited, *Eaton* v. *Wilkins* (1912) 163 Cal. 742, 747 [127 P. 71].) Later cases have indicated, however, that certain more peripheral and essentially derivative portions of the *Biddle Boggs* formulation are to be viewed in the factual context of that case and are not to be taken as abstract statements of requirements more restrictive than those normally requisite to the application of equitable estoppel.

Thus in *Davis* v. *Davis, supra,* 26 Cal. 23, although we emphasized that the conduct of the party to be estopped must be either intended to deceive or so grossly and culpably negligent as to be tantamount to fraud, we indicated that the third element of the *Biddle Boggs* formulation—to wit, that the party raising the estoppel "was not only destitute of all knowledge of the true state of the title, but of the means of acquiring such knowledge" —was not meant to be given a strict literal interpretation. "We are satisfied the learned Judge who pronounced this opinion [*Biddle Boggs*] did not intend by the language employed to hold that a person must be destitute of all possible means of acquiring knowledge of the true state of the title, but

insecurity of titles if they were allowed to be affected by parol evidence of light or doubtful character.' The most important 'ground of justice and equity' admitted by courts of equity to uplift and displace the statute of frauds concerning legal titles to land, by fastening a liability upon the wrongdoer, is fraud. There are many instances in which equity thus compels the owner of land to forego the benefits of his legal title and to admit the equitable claims of another, in direct contravention of the literal requirements of the statute, but they all depend upon the same principle." (3 Pomeroy, Equity Jurisprudence (5th ed. 1941) § 807, p. 203, fns. omitted.)

[24]We have in fact indicated that some element of turpitude on the part of the party to be estopped is requisite even in cases not involving title to land. (See *Crestline Mobile Homes Mfg. Co.* v. *Pacific Finance Corp.* (1960) 54 Cal.2d 773, 778-779 [8 Cal.Rptr. 448, 356 P.2d 192].)

rather of all convenient or ready means to such end; . . ." (26 Cal. at p. 41.)[25] This conclusion reflected our concern that the doctrine of equitable estoppel in California remain consistent with that doctrine as applied in other American jurisdictions and in England.[26]

Similarly, later cases have made manifest that the statement in *Biddle Boggs* apparently requiring that the party to be estopped "was apprised of the true state of his own title" was not intended to place a restriction upon the normal requirement that knowledge of the true facts *either* be possessed by the party to be estopped *or* be imputed to him in light of the circumstances.[27] Especially in cases where the party to be estopped has made affirmative representations, as opposed to mere silence or acquiescence, knowledge of the true facts will be imputed to one who, in the circumstances of the case, ought to have such knowledge. (See *Grants Pass Land & Water Co.* v. *Brown* (1914) 168 Cal. 456, 462 [143 P. 754]; *Frericks* v. *Sorensen* (1952) 113 Cal.App.2d 759 [248 P.2d 949]; cf. *Staniford* v. *Trombly* (1919) 181 Cal. 372, 378 [186 P. 599].)[28]

It thus appears that the doctrine of equitable estoppel applied to questions of land title in this jurisdiction differs from that applied to questions involving other matters only in that the culpability of the party to be estopped must be of sufficient dimension that actual or constructive fraud would result if the estoppel were not raised. (But see fn. 24, *ante.*) (See

[25]The quoted language was made a part of the Code Commissioners' Notes upon the adoption of section 1962 of the Code of Civil Procedure in 1872.

[26]The general rule on this point is stated by Pomeroy: "If, at the time when he acted, [the party claiming the benefit of estoppel] had knowledge of the truth, or had the means by which with reasonable diligence he could acquire the knowledge so that it would be negligence on his part to remain ignorant by not using those means, he cannot claim to have been misled by relying upon the representation or concealment." (3 Pomeroy, Equity Jurisprudence (5th ed. 1941) § 810, p. 219, fn. omitted.)

[27]Pomeroy states the general rule as follows: "The truth concerning these material facts represented or concealed must be known to the party at the time when his conduct, which amounts to a representation or concealment, takes place; *or else the circumstances must be such that a knowledge of the truth is necessarily imputed to him.*" (3 Pomeroy, Equity Jurisprudence (5th ed. 1941) § 809, p. 216, original italics.)

[28]"[The requirement of actual knowledge of the true facts on the part of the party to be estopped] applies in its full force only in cases where the conduct creating the estoppel consists of silence or acquiescence. It does not apply where the party, although ignorant or mistaken as to the real facts, was in such a position that he *ought* to have known them, so that knowledge will be imputed to him. In such a case, ignorance or mistake will not prevent an estoppel. Nor does the rule apply to a party who has not simply acquiesced, but who has actively interfered by acts or words, and whose affirmative conduct has thus misled another. Finally, the rule does not apply, even in cases of mere acquiescence, when the ignorance of the real facts was occasioned by culpable negligence." (3 Pomeroy, Equity Jurisprudence (5th ed. 1941) § 809, pp. 217-219, fns. omitted.)

generally 3 Pomeroy, Equity Jurisprudence (5th ed.. 1941) § 803, pp. 184-188.) ■■■ We proceed to assess the stipulated facts in this case in order to determine (1) whether the conduct of the state and city was sufficient to support an equitable estoppel against them, and (2) whether the other elements of such an estoppel are here present.

We conclude without hesitation that the activities, representations, and conduct of the state and its subtrustee the city during the period here in question rise to the level of culpability necessary to support an equitable estoppel against them relative to the lands described in section 2(a) of chapter 1688. The stipulated facts clearly establish that from an early date the state and city have been aware of the serious and complex title problems in the Alamitos Bay area. More importantly, those public entities have been in a position to resolve such problems and to determine the true boundaries between public and private lands. This they have not done. Instead they have conducted themselves relative to settled and subdivided lands in the section 2(a) area as if no title problems existed and have misled thousands of homeowners in the process. Under these circumstances we think it clear that knowledge of the true boundaries between state and private lands in the section 2(a) area must be imputed to the public entities in question, and that their conduct in light of this imputed knowledge must be deemed so culpable that fraud would result if an estoppel were not raised.

Although it seems unnecessary to do so, we wish to make clear that the stipulated facts presented to us do not in any way indicate, nor do we in reaching our conclusion intimate, the occurrence of any acts of wilful or deliberate fraud on the part of any of the agents or representatives of the state or city. We merely say that the collective conduct of both governmental entities over the years reaches that degree of culpability interdicted by the doctrine of estoppel and that the principle of justice and fair dealing inherent in that doctrine dictates that we apply it in this case. Indeed, as we have said, it is to the credit of the state and the city that they themselves have invoked it.

Moreover, we have no difficulty concluding that the homeowners in the section 2(a) area were without any convenient or ready means for ascertaining that knowledge which the circumstances of this case require that we impute to the state and city—to wit, knowledge of the true boundaries between public and private lands in the area. We therefore hold that their reliance upon the conduct of the public entities was reasonable. Clearly this reliance induced a change of position on their parts which would result in substantial injury to themselves or their successors in interest if the state and city were now permitted to take a position contrary to the purport of their former conduct.

For these reasons we have concluded that the elements of an equitable estoppel against the state and city are here present. This determination, however, falls one step short of the mark. The state and city are not private parties but government entities bound by constitutional and other restrictions. Although the elements of an equitable estoppel are established by the facts, it remains to determine whether that doctrine may be applied at all in a case such as that at bench to prevent the state and city from asserting paramount title to lands which they hold in trust for the people and which are subject to a constitutional provision forbidding alienation. The issue, stated bluntly, is this: When the state, acting both directly and through its subtrustee the city, conducts itself relative to public trust lands in a manner which would estop it from asserting paramount title if it were a private person, can it be bound by a similar estoppel—even when the effect thereof would be to quiet title to such trust lands in private persons in the face of an express constitutional provision forbidding the alienation of such lands?

It is settled that "[t]he doctrine of equitable estoppel may be applied against the government where justice and right require it. (*United States Fid. & Guar. Co.* v. *State Board of Equalization* (1956) 47 Cal.2d 384, 388-389 [303 P.2d 1034] and cases there collected.)" (*Driscoll* v. *City of Los Angeles, supra,* 67 Cal.2d 297, 306.) (See generally 28 Am. Jur.2d, Estoppel and Waiver, §§ 122-133, pp. 782-802; 31 C.J.S., Estoppel, §§ 138-147, pp. 675-733.) Correlative to this general rule, however, is the well-established proposition that an estoppel will not be applied against the government if to do so would effectively nullify "a strong rule of policy, adopted for the benefit of the public, . . ." (*County of San Diego* v. *Cal. Water etc. Co.* (1947) 30 Cal.2d 817, 829-830 [186 P.2d 124, 175 A.L.R. 747], see also cases there cited.) The tension between these twin principles makes up the doctrinal context in which concrete cases are decided.

The leading case of *County of San Diego* v. *Cal. Water etc. Co., supra,* 30 Cal.2d 817, demonstrates the operation of this tension. There a highway maintained by the county lay in an area which was expected to be flooded upon construction of a proposed dam. Desiring to alter the curvature of the highway and to replace a bridge, the county applied to the defendant water company, which was to build the dam and owned the land through which the then highway passed, for a temporary right of way to be used until it became necessary upon actual construction of the dam to move the highway to higher ground. The company granted the temporary right of way, providing in the deed that the right of way should revert to the company upon construction of the dam or completion of the permanent highway, and that by acceptance of the easement the county waived any claim for damages that might arise in connection with the construction of the dam. The deed was accepted and recorded by the county and the road and bridge

were relocated. When several years later the company began its dam it offered a new easement above the contemplated water line but instituted no eminent domain proceedings to condemn the road. The county brought an action to enjoin construction of the dam unless adequate compensation were paid.

The trial court held that the county was entitled to relief, and we agreed. Holding first that the county's acceptance of the easement created no binding or valid *contractual* obligation to forego damages (because statutory requirements necessary to such an obligation had not been fulfilled), we went on to consider the company's argument of equitable estoppel, wherein it was contended "that the acceptance of the waiver clauses in the easements, although void as a contract, may nevertheless be considered as a part of the course of conduct by which it is claimed that the county led the company to believe that the road would be relocated." (30 Cal.2d at p. 825.) We emphasized that the acceptance of the easement under the questioned deed provisions was the only conduct which might reasonably have induced the company to believe that the county intended to bear the expenses of relocation itself. Moreover, by distinguishing cases wherein the party seeking to raise an estoppel against the government had undertaken improvements in reliance upon government conduct or representations (e.g., *City of Los Angeles* v. *Cohn* (1894) 101 Cal. 373 [35 P. 1002]), we suggested that the injury suffered by the company as a result of its reliance was not extreme in character. On the other hand, we pointed out that the raising of an estoppel against the county would result in the frustration of a strong rule of public policy in that it would permit evasion of strict statutory procedures: "Here . . . we are directly concerned with strong considerations of policy. The Legislature, for the protection of the public, has declared that a road may not be abandoned without notice, a hearing, and a finding that the road is unnecessary for present or prospective public use. Enforcement of a bare promise to abandon would not only mean a complete disregard of these salutary legislative requirements but would also be inconsistent with the additional policy against the making of contracts by a public body to exercise its discretionary governmental powers in a particular manner. By indirect enforcement of such a 'contract' the needs of persons using the highway might be ignored, and a method would be afforded by which officials and persons dealing with the agency could evade the law. (Cf. *Miller* v. *McKinnon,* 20 Cal.2d 83, 88-90 [124 P.2d 34, 140 A.L.R. 570].)" (30 Cal.2d at pp. 826-827.)[29]

---

[29] In the *County of San Diego* case we distinguished the case of *Farrell* v. *County of Placer* (1944) 23 Cal.2d 624 [145 P.2d 570, 153 A.L.R. 323], wherein the county was estopped to raise plaintiff's failure to file a timely claim against it after a county agent, visiting plaintiff in the hospital after the accident but within the period for

In *City of Imperial Beach* v. *Algert* (1962) 200 Cal.App.2d 48 [19 Cal. Rptr. 144] (hearing denied), on the other hand, it was concluded in a similar case that the tension existing between the two stated principles should be resolved differently in light of the circumstances. There a certain portion of a street delineated on an approved county subdivision map was never opened for street purposes, and the subdivider placed a full concrete curb at the point where the subject portion was to meet a cross street. By formal order of the county board of supervisors the portion in question was closed to traffic, and thereafter taxes were levied against it as private property. When taxes became delinquent the property was sold to defendant at public auction, and when the city was later incorporated the official map did not show the parcel as a street. The parcel was later zoned residential by city ordinance. Some time after defendant received his deed the board of supervisors, without notice to defendant, purported to vacate its order (made some 10 years previously) closing the subject portion of street to traffic. A quiet title action ensued, and the trial court held the city estopped to assert that the parcel in question was a public street.

The Court of Appeal, after recognizing that a governmental entity cannot lose its right to a duly dedicated public street by mere nonuser, adverse possession, or abandonment accomplished other than in a statutory manner, nevertheless agreed that the city was bound by an equitable estoppel. (*City of Imperial Beach* v. *Algert, supra,* 200 Cal.App.2d 48.) Stating in colorful terms the doctrinal tension to which we have adverted,[30] the court went on to point out that the case before it, unlike *County of San Diego* and related cases, involved an impressive *combination* of governmental acts encouraging reliance.[31] Viewing this combination as a whole, the court concluded: "We

---

filing a claim, encouraged plaintiff not to obtain the services of an attorney and represented to her that she could wait to make a claim until she knew the extent of her injuries. In *Farrell* and the cases cited therein, we said in *County of San Diego,* "the facts clearly established that a grave injustice would be done if estoppel were not applied, and it did not appear that use of the doctrine would defeat any strong public policy or result in the indirect enforcement of an illegal contract." (30 Cal.2d at p. 826.)

[30]The court said: "The courts of this state have been careful to apply the rules of estoppel against a public agency only in those special cases where the interests of justice clearly require it. (*Sacramento* v. *Clunie,* 120 Cal. 29, 30 [1] [52 P. 44]; *County of San Diego* v. *California Water etc. Co., supra,* pp. 825, 826 [4-6].) However, if such exceptional case does arise and if the ends of justice clearly demand it, estoppel can and will be applied even against a public agency. Of course, the facts upon which such an estoppel must rest go beyond the ordinary principles of estoppel and each case must be examined carefully and rigidly to be sure that a precedent is not established through which, by favoritism or otherwise, the public interest may be mulcted or public policy defeated." (200 Cal.App.2d at p. 52.)

[31]The court stated: "What we . . . have [in the case at bench] is a bare dedication by map, with every other act of county and city over a period of many years indicating a clear affirmative rejection of its acceptance as a street. The affirmative

are not prepared to say what portion of this total chain of events, if missing, would vitiate the use of equitable estoppel. What we do hold is that the sum total of all the facts actually here presented convinces us, as it did the trial judge, that this case presents one of those exceptional conditions in which estoppel against a governmental agency is justified and should be applied." (200 Cal.App.2d at p. 53.)

Implicit in this conclusion, of course, was the determination that the raising of an estoppel against the government in the circumstances at bench would not result in a significant frustration of public policy. (See fn. 30, *ante.*)

We have stated the *County of San Diego* and *Algert* cases in some detail because the contrast between them vividly demonstrates the tension which exists between the competing principles at work in the area of estoppel against the government—to wit, the principle favoring avoidance of manifest injustice, and that seeking to preserve the public interest. For this reason the same contrast provides an apt background against which to state a broad and comprehensive standard governing the mutual accommodation of those principles in concrete cases. ■ After a thorough review of the many California decisions in this area, as well as a consideration of various out-of-state decisions, we have concluded that the proper rule governing equitable estoppel against the government is the following: The government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which

---

uncontradicted evidence shows that the parcel in question was never used at any time during the 12 years from the time of original map dedication to the time of trial, for any road or traffic purpose of any kind, either vehicular or pedestrian. No public money was ever expended on it for road purposes up to the time of its sale to Algert nor at any other time. Every affirmative act of the county and city indicated an intention not to use it for street purposes. Permanent concrete curbs were installed by the subdivider, under county authority, to block it off physically from traffic use. The county levied ordinary taxes on it as a privately owned parcel. It retained at all times to the eye of any prospective purchaser all the appearance of a private residential lot. It was zoned by City for private residential purposes. The City's official map showed it as a residential lot. It was assessed for improvement district purposes by authority of the board of supervisors as a privately owned lot. Neither adjacent owners nor any other owners displayed any interest in having it opened as a street, nor in any possible reversionary interest. Indirectly all the owners within the improvement district received the benefit of Algert's purchase money. The county, through its official agent, the county treasurer, advertised it for sale at public auction as private property. No one ever suggested to the treasurer that he ought not to issue the deed. No one, even after the full facts were known to all, ever suggested, that a mistake had been made and that because thereof Algert's money should be refunded. Even the evidence of the City's present desire to use the property for street purposes presents some contradictions respecting connecting street widths at the point in question that have raised arguments as to the City's true intent." (200 Cal.App.2d at pp. 52-53.)

would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel.

Certain arguments advanced by respondents have suggested that the cases do not support a standard of such broad simplicity. Thus, it is contended on the basis of the *County of San Diego* case and certain other decisions of this court (see, e.g., *Taylor* v. *Spear* (1925) 196 Cal. 709, 717 [238 P. 1038]; *Boren* v. *State Personnel Board* (1951) 37 Cal.2d 634, 643 [234 P.2d 981]; *McNeil* v. *Board of Retirement* (1958) 51 Cal.2d 278, 285-286 [332 P.2d 281]) that a fundamental distinction is to be recognized between those cases where the public entity to be estopped has the legal power to accomplish directly what the estoppel will accomplish indirectly, and, on the other hand, those cases where the public entity does not have such power. In the latter class of cases, it is urged, an estoppel may not be applied against the public entity because to do so would effectively enlarge the powers of the public entity involved. ▮ Applying this distinction to the instant case respondents contend that the state and city may not be estopped to assert paramount title to the section 2(a) lands in question because to permit such estoppel would result in the effective alienation of tidelands within two miles of the city—an act expressly placed beyond the powers of the state and city by article XV, section 3, of the California Constitution.

Although there is language in some decisions (including those cited above) which might be considered supportive of the distinction urged, we believe that a thoughtful consideration of their precise holdings reveals an underlying rationale similar to that which we have set forth above. The *County of San Diego* case again provides a ready example. There it was clear that the county was without the power to do what it had presumed to do—to wit, to abandon a public highway without complying with statutory requirements of notice and hearing. This court, however, was not content to rest its decision on that fact. Rather, we went on to explain that to allow the county to do what it had presumed to do (and clearly lacked the power to do) would operate to frustrate the strong rule of public policy which the statutory requirements represented. "Enforcement of a bare promise to abandon would not only mean a complete disregard of these salutary legislative requirements but would also be inconsistent with the additional policy against the making of contracts by a public body to exercise its discretionary governmental powers in a particular manner. By indirect enforcement of such a 'contract' the needs of persons using the highway might be ignored, and *a method would be afforded by which officials and persons dealing with the agency could evade the law.*" (Italics added.) (30 Cal.2d

at pp. 826-827.) In essence we determined that the injustice to be suffered if an estoppel were not upheld was *not* of sufficient dimension to justify the extreme deleterious effect upon public policy which would result if the estoppel were raised.

In the *Algert* case, on the other hand, the act sought to be validated by estoppel was similarly beyond the power of the government agency, but the court determined on the one hand that an injustice of substantial dimension would ensue if estoppel were withheld and, inferentially, that no significant effect upon public policy would result if the estoppel were raised. In assessing the quantum of injustice the court properly took into account the continuing course of conduct by which the governmental agency had induced reliance. The nature of that course of conduct also was of extreme relevance in assessing the effect upon public policy which would result from the raising of an estoppel. While in *County of San Diego* the raising of an estoppel would have permitted county officials to avoid statutory abandonment requirements by little more than a "bare promise to abandon," in *Algert* the precedent set by allowing estoppel was much narrower in that it depended upon a considerable combination of governmental actions not likely to recur.[32]

It may be objected that the distinction sought to be established by respondents is not properly considered in the context of *County of San Diego* and related cases because in those cases the governmental entity had the authority to accomplish by proper means what it purported to do by improper means (i.e., abandon dedicated streets)—whereas in a case such as that at bar the governmental entity lacks the power to accomplish by any means the alienation of the tidelands in question.[33] We believe that such a contention would ignore the principles which we have explained above in connection with the cases of *Muchenberger* v. *City of Santa Monica, supra,* 206 Cal. 635, and *Atwood* v. *Hammond, supra,* 4 Cal.2d 31, respectively. If the perimeters of the lands described in section 2(a) of chapter 1688 had been established by a boundary agreement of the type described in *Muchenberger* there would be no constitutional objection to the formal "conveyance" of any state interest in such lands by quitclaim. (See also *City of Los Angeles* v. *Borax Consolidated Ltd., supra,* 102 F.2d 52.) Similarly, if the said lands had been freed from the public trust and reclaimed pur-

---

[32]Also of considerable relevance in the assessment of injustice vis-à-vis the effect upon public policy is the degree to which the party seeking to raise an estoppel against the government has changed his position in reasonable reliance on government representations or conduct and the extent to which he will be injured should the estoppel not be raised. (See *City of Los Angeles* v. *Cohn, supra,* 101 Cal. 373.)

[33]The contention is stated in the subjunctive because respondents rely heavily on *County of San Diego* to support the distinction urged by them.

suant to and in the course of a highly beneficial public program of harbor development, and if they were considered relatively small in area, they could be properly alienated into private hands. (*Atwood* v. *Hammond, supra.*) In view of these principles it would be unrealistic to assert that the state wholly lacks the power to dispose of lands within two miles of an incorporated city which might be adjudged to be public tidelands in a quiet title proceeding. Because the state does have such power, albeit only in narrowly limited circumstances, it is unnecessary for us to decide whether the standard which we have stated to govern the application of estoppel against governmental entities holds true in a case where the governmental entity in question utterly lacks the power to effect that which an estoppel against it would accomplish.

It remains to apply the stated standard to the facts of this case. Because we have already determined that the elements requisite to equitable estoppel against a private party are here present, the precise question now before us is this: Is the injustice which would result from a failure to raise an equitable estoppel against the city and state (preventing their assertion of paramount title to section 2(a) lands) of sufficient dimension to justify the effect upon public interest or policy which will result from the raising of such an estoppel?

As we have explained above, the peculiar context in which the argument of equitable estoppel arises in the instant case requires that we assume for these purposes that, if a quiet title action were brought relative to the lands described in section 2(a) of chapter 1688, and the state were permitted to assert paramount title to such lands, it would prevail as to some portion thereof. Assuming this, it is clear that the present holders of record title against whom such a claim of paramount title would prevail would suffer manifest injustice unless the state were estopped to assert such a claim. It is unnecessary that we again detail the sustained course of conduct by which the state and its subtrustee the city have induced reliance on the part of private persons holding record title in the section 2(a) area. It suffices to say that ever since the development of the area began shortly after the turn of the century the state and (after annexation in 1923) the city have conducted themselves relative to the section 2(a) lands as though the said lands were private property wholly free from trust claims. In reliance upon this conduct thousands of citizens have settled upon these lands with the same expectations as citizens settling on other lands within the city. It is superfluous to say that manifest injustice would result if the very governmental entities whose conduct has induced this reliance were permitted at this late date to assert a successful claim of paramount title and thereby wrest the subject property from the homeowners who have settled upon it.

(Cf. *Trustees of Internal Improvement Fund* v. *Claughton* (Fla. 1956) 86 So.2d 775.)

On the other hand we do not believe that the upholding of an estoppel in the instant case will have a significant deleterious effect upon the public policy reflected in article XV, section 3, of the Constitution. That policy, broadly speaking, seeks to insure that certain lands of unique value to the public for navigational and related purposes shall not, through alienation into private hands, be shorn of that public value. We must assume in this case that some of the lands described in section 2(a) of chapter 1688 are in fact lands subject to article XV, section 3, and that therefore the upholding of an estoppel (which in the circumstances would be tantamount to alienation) would be contrary to the public policy reflected in that section. We believe, however, that a realistic assessment of such an estoppel on the public policy in question must, in the circumstances of this case, include within its purview an overall consideration of the whole process of development in the Alamitos Bay area. That process, however haphazard and reckless it may have been, has resulted in an area providing an impressive array of public facilities for navigation and recreation.[34] Surely this is not a case where "alienation" of public lands into private hands has resulted in an area withdrawn from the public.

Even more significant, we think, from the standpoint of assessing the effect of estoppel upon the public policy in question, is the fact that the rare combination of government conduct and extensive reliance here involved will create an extremely narrow precedent for application in future cases. (See fn. 30 and text accompanying fn. 32.) We are here concerned with thousands of homeowners who, through the long continuing conduct of the government entities involved, have been led to believe and have acted upon the belief that the lands upon which they reside are their own private properties. Because similarly compelling circumstances will not often recur, the public policy expressed in article XV, section 3, of the Constitution will not suffer substantial erosion as a result of the decision we reach today.

---

[34]The agreed statement of facts provides: "Today, Alamitos Bay has 13.1 miles of shore line of which 11 miles, or 83%, are open and accessible to the public. The public facilities in the bay area are used on a regional and statewide basis as is indicated from the fact that 70.5% of the 1,765 public boat slips are rented by persons living outside the City (28% by persons living outside Los Angeles County). Marine Stadium, located in the northwesterly corner of the Bay area, has hosted two Olympic boating competitions and numerous national and regional contests. It is open for daily use by the public as a water ski and power boat course. Open water areas of the Bay are used for sailing. The Bay's bathing areas are used on a regional basis, as indicated from the fact that 48.9% of the 14,900,000 persons using the City's beaches annually are from outside the City (15.1% are from outside the county). Sport fishermen and clammers also make extensive use of the Bay."

For the foregoing reasons we have concluded that the great injustice which would result in this case from the failure to uphold an equitable estoppel against the state and city justifies the minimal effect upon public policy which would result from the raising of such an estoppel—and therefore that this is one of those "exceptional cases" where "justice and right require" that the government be bound by an equitable estoppel. (*County of San Diego* v. *Cal. Water etc. Co., supra,* 30 Cal.2d 817, 825; *Farrell* v. *County of Placer, supra,* 23 Cal.2d 624, 627-628.) Because such an estoppel would prevent the state and city from asserting paramount title to any of the section 2(a) lands in an action to quiet title and would determine title between the parties[35] (cf. *Hudson* v. *West* (1957) 47 Cal.2d 823, 830-831 [306 P.2d 807], and cases there cited), there remains no legal objection to those portions of the Belmont agreement which operate to relinquish all state and city claims to the section 2(a) lands. (Cf. *Muchenberger* v. *City of Santa Monica, supra,* 206 Cal. 635, 645.)

For all of the reasons stated above, we have concluded that respondents' constitutional objections to chapter 1688 and the Belmont and McGrath agreements are without merit. The relief sought by petitioners must therefore be granted.

Let a peremptory writ of mandate issue as prayed.

McComb, Acting C. J., Peters, J., Tobriner, J., Burke, J., Mosk, J., and Files, J.,* concurred.

---

APPENDIX A

Chapter 1688, Statutes of 1965

An act relating to tide and submerged lands in the Alamitos Bay area in the City of Long Beach, providing for the removal of the public trust for commerce, navigation and fishery from certain portions of land, providing for the removal of the trusts and restrictions imposed by Chapter 676, Statutes 1911, Chapter 102, Statutes 1925 and Chapter 158, Statutes 1935, as to certain portions of lands, authorizing the sale, exchange, quitclaim or conveyance of certain portions of lands, providing for the settlement of boundary and title disputes as to said lands.

[Approved by Governor July 17, 1965, Filed with Secretary of State July 23, 1965.] The people of the State of California do enact as follows:

Section 1. As used in this act:

(a) "Long Beach tidelands" means those certain tide and submerged lands, whether filled or unfilled, heretofore conveyed to the City of Long Beach upon certain trusts and conditions by Chapter 676, Statutes 1911, Chapter 102, Statutes of 1925 and Chapter 158, Statutes of 1935, all as amended and supplemented.

---

[35]That is, between the government on one side and a particular homeowner on the other.

*Assigned by the Acting Chairman of the Judicial Council.

(b) "Alamitos Bay area" means that area within the City of Long Beach, County of Los Angeles, State of California, enclosed by a line. . . . [Here is set forth a description by metes and bounds.]

Sec. 2.(a) It is found and determined that the following described lands within the Alamitos Bay area lie above the line of mean high tide are no longer necessary or useful for commerce, fisheries and navigation and are hereby freed from the public use and trust for commerce, fisheries and navigation to the extent such may have existed as to any of said lands. . . . [Here is set forth a description by metes and bounds.]

The State Lands Commission is authorized to survey, monument, plat or map the above-described boundaries of the lands described in this subdivision, and to file said plats or maps in the office of the County Recorder of the County of Los Angeles.

(b) It is found and determined that portions of land in the Alamitos Bay area in addition to those described in subdivision (a) of Section 2 of this act have been heretofore improved in connection with the development of the Alamitos Bay area, and in the process of said development have been filled and reclaimed, are no longer submerged or below the line of mean high tide and are no longer necessary or useful for commerce, fisheries or navigation. The State Lands Commission is hereby directed to determine the lands described in this subdivision and to execute and record in the office of the County Recorder of the County of Los Angeles appropriate instruments describing said lands. Upon the recording of any such instrument or instruments, together with a certificate that the lands described therein are above the line of mean high tide and have been found to be no longer necessary or useful for commerce, fisheries or navigation, said described lands shall be thereupon freed of the public use and trust for commerce, fisheries and navigation. Such determinations shall be made from time to time by the State Lands Commission on its own initiative or shall be made on the application of the City of Long Beach or other affected party.

Sec. 3.(a) The City of Long Beach, by such document, quitclaim or conveyance, and upon the receipt of such considerations as are hereinafter authorized or described in this act, may convey, release or quitclaim its interest in property contained within the description of subdivision (a) of Section 2. Said document, quitclaim or conveyance may by its terms operate generally and by declaration and without specifying the name of any person and shall operate as to any parcel of land within the described area only in favor of such persons as have, at the time of said conveyance, release or quitclaim, a claim of ownership to said parcel based upon a record chain of title, which chain of title covers a period of 30 years or more immediately preceding the effective date of this act or in favor of such persons as have, at the time of said conveyance, release or quitclaim, a claim of ownership to said parcel, which claim is based upon a record chain of title of less than 30 years and upon the payment of taxes on said property by claimant or his predecessors in interest for a period of 30 years or more, which period of payment of taxes covers the period immediately preceding the effective date of this act.

(b) The City of Long Beach, by such document, quitclaim or conveyance, and upon the receipt of such considerations as are hereinafter authorized or described in this act, may convey, release or quitclaim any portions of Long Beach tidelands described in any instrument recorded pursuant to subdivision (b) of Section 2. There shall be an order of preference as to the persons in favor of which such document, quitclaim or conveyance may be executed. Said order shall be: First, to any person claiming present ownership of said property based upon a record chain of title, which chain of title covers a period of 30 years or more immediately preceding the effective date of this act. Second, to any person who, together with his claimed predecessors in interest, has paid taxes on said property to the County of Los Angeles for a period of 30 years or more immediately preceding the effective date of this act. Third, to such abutting landowner as has the longest common boundary with the property to

be conveyed, released or quitclaimed. Fourth, to other parties as are approved by the State Lands Commission.

(c) The City of Long Beach, with the approval of the State Lands Commission, is hereby authorized to settle by agreement, exchange or quitclaim, any dispute concerning whether or not particular land within the Alamitos Bay area constitutes land in private or proprietary ownership by reason of title traceable to a state or federal patent or other valid source, or rather constitutes "Long Beach tidelands," title to which is vested in the city under the terms of Chapter 676, Statutes of 1911, Chapter 102, Statutes of 1925, or Chapter 158, Statutes of 1935. In settlement of such disputes the city, with the approval of said State Lands Commission, may, by such agreement, exchange or quitclaim, establish boundary or compromise boundary lines between the "Long Beach tidelands" and bordering private or proprietary lands.

Sec. 4. Any consideration as is paid in exchange for any conveyance, release, quitclaim, or settlement under this act shall be determined by the City of Long Beach with the approval of the State Lands Commission. In determining the adequacy of any such consideration, said city and commission shall give effect in their evaluation to all factors bearing upon the value, if any, of the public's interest being conveyed, released, quitclaimed or settled, and the rights, claims and equities of the person in whose favor the conveyance, release, quitclaim or settlement is being made and their predecessors in interest. In those cases where the land has been filled or reclaimed or improved or both without the expenditure of either state funds or of public moneys held in trust under the terms of Chapter 676, Statutes of 1911, Chapter 102, Statutes of 1925, Chapter 158, Statutes of 1935, Chapter 29, Statutes of 1956, or Chapter 138[,] Statutes of 1964, First Extraordinary Session, such lands may be valued by excluding the value of the fill or improvements or both. Consideration under this act may consist of lands, property, interest in property, easements, moneys or other things of value given by the grantee or any other person.

Sec. 5. Any portion of Long Beach tidelands which passes in title by reason of any conveyance, release, quitclaim or settlement made under the terms of this act shall thereupon be freed of the trusts and conditions imposed by Chapter 676, Statutes of 1911; Chapter 102, Statutes of 1925; Chapter 158, Statutes of 1935, all as amended and supplemented.

No land which lies below the line of mean high tide may be conveyed, released or quitclaimed by the City of Long Beach under the terms of this act, nor shall any such land be freed by the terms of this act of the trusts and conditions imposed by Chapter 676, Statutes of 1911; Chapter 102, Statutes of 1925; Chapter 158, Statutes of 1935, all as amended or supplemented. Any certificate of the State Lands Commission concerning the character of the lands described in the instruments recorded under the provisions of subdivision (b) of Section 2 of this act shall be conclusive as to the character of lands declared therein to be above the line of mean high tide.

Except for those lands described in subdivision (a) of Section 2 of this act, any document, quitclaim or conveyance executed pursuant to the provisions of subdivision (b) of Section 3 of this act shall reserve to the City of Long Beach as trustee, or to the State of California if the lands fall within the provisions of Chapter 1579, Statutes 1961, all oil, gas, minerals, and other hydrocarbons in any lands found to be Long Beach tidelands. The reservation of said rights to minerals, oil, gas or other hydrocarbons shall not preclude the conveyance, release or quitclaim of the right of entry upon the surface of said lands for the purposes of drilling, mining or extraction of those reserved interests.

Sec. 6. Any conveyance, release, quitclaim or settlement made by the City of Long Beach pursuant to the provisions of this act shall be made by an appropriate document executed by the City of Long Beach and approved by the State Lands Commission.

Sec. 7. (a) All lands or interests in lands which lie below the line of mean high

tide and are received by the City of Long Beach as a result of sales or exchanges authorized by this act shall be deemed tidelands under the provisions of Chapter 676, Statutes 1911; Chapter 102, Statutes of 1925; and Chapter 158, Statutes of 1935, all as amended or supplemented.

(b) All lands or interests in lands which lie above the line of mean high tide and are received by the City of Long Beach as a result of sales or exchanges authorized by this act shall be deemed lands upward of the compromise line and acquired with tideland trust moneys, under and according to the provisions of Section 7 of Chapter 138, Statutes of 1964, First Extraordinary Session.

(c) All moneys and other things of value, excluding land interests in lands, which are received by the City of Long Beach as a result of sales or exchanges authorized by this act shall be used only for those trust purposes defined in Chapter 676, Statutes of 1911; Chapter 102, Statutes of 1925; Chapter 158, Statutes of 1935, Chapter 29, Statutes of 1956; and Section 6 of Chapter 138, Statutes of 1964, First Extraordinary Session, all as amended and supplemented.

(d) All oil and dry gas revenues derived from any lands received by the City of Long Beach as a result of sales or exchanges authorized in the foregoing section of this act shall be subject to the terms and conditions of Chapter 138, Statutes of 1964, First Extraordinary Session.

Sec. 8. The provisions of this act shall not be deemed exclusive with respect to the settlement or litigation of titles and boundaries of lands within the Alamitos Bay area and this act shall not alter or impair the existing procedural or substantive rights or disabilities of any person or entity claiming title to or an interest in any lands in the Alamitos Bay area in the defense or prosecution of any proceeding now or hereafter instituted under the laws of this state, nor affect the applicability to said lands of any other provision of law.

Sec. 9. If any provision of this act or the application thereof to any person or circumstance is held invalid, such invalidity shall not affect other provisions or applications of the act which can be given effect without the invalid provision or application, and to this end the provisions of this act are severable.

## APPENDIX B

### EXCERPTS FROM DEBATES AND PROCEEDINGS, CALIFORNIA CONSTITUTIONAL CONVENTION 1878-1879
#### (PP. 1038-1039; 1478-1481)

MR. LAINE: [In response to reading of proposed section.] Mr. Chairman: I move to strike that section out. I am satisfied that it is dangerous, because there may be millions of acres of land that may be reserved. I move to strike it out.

MR. AYERS: [Principal proponent of Article XV.] I hope the motion will not prevail. The provision in the commencement of this section is one which now exists in the Code. It withdraws the marsh and tide lands from sale within two miles of any incorporated city or town in the State. The object of this section is to prevent parties from coming up to Sacramento and obtaining title to tide lands which are necessary for the purpose of ingress and egress to the people from various parts of the State— I was going to say surreptitiously getting control over them in fee from the State— and the people who are interested in having ingress and egress over these lands, or through these lands, know nothing about it. . . .

\* \* \*

MR. HERRINGTON: Mr. Chairman: I am just as much in favor of preserving the rights of the people to frontages as anybody in the world; but it does strike me if this constitutional provision is adopted there will be no such thing as the reclamation of

these tide lands for the purpose of constructing towns. Now, we do not desire to tie ourselves up in such a way as to prevent the increase of population on the borders of our bay or ocean. The idea that the land shall be held in that way, so that it can be granted out to private parties under such circumstances, seems to me to be impolitic, to say the least of it; that land shall be reserved two miles back from the bay, simply because it is tide land. I am perfectly willing to place restrictions in every way to protect these frontages, but to say that all tide lands within two miles of any incorporated city or town in this State shall be withheld from grant or sale, it seems to me is not proper in a constitutional provision.

MR. WYATT: Mr. Chairman: I hope the section will not be stricken out. If there is any one abuse greater than another that I think the people of the State of California has suffered at the hands of their lawmaking power, it is the abuse that they have received in the granting out and disposition of the lands belonging to the State, and I hope the Convention will make such restrictions upon that subject as it can; at least to remedy the abuse in so far as it can be remedied with reference to the little land yet left to the jurisdiction of the State. . . .

\* \* \*

MR. McCALLUM: . . . In a very populous county—if not now there likely will be some that I could name—there might be towns all along where these tide waters are, and it would certainly exclude the disposition of these lands along the whole line of tide water. The Legislature of course ought not to dispose of these lands without proper guards and conditions to prevent frauds, but to say that they shall not be disposed of at all is virtually to give them away; virtually to say that the State shall have no benefit, except with reference to these leases. I am not familiar with these tide lands, but I understand that some of these tide lands may be very valuable for certain agricultural purposes. I presume that the time may come when they may be disposed of at a considerable price per acre. . . .

\* \* \*

MR. EDGERTON: . . . Are these mud-banks to lay there forever? Whereas, if they could be sold and filled in they would be covered with buildings, wharves, and warehouses. The arguments that would apply to Oakland will apply to fifteen or twenty other places. These mud-flats ought to be reclaimed and applied to the uses of commerce and buildings, wharves and warehouses erected where seagoing vessels can load and unload. It seems to me very unwise to put such a restriction as this in the Constitution. . . .

\* \* \*

MR. HAGER: Mr. President: This question of tide lands has been before the Legislature again and again. As we all know, a great many abuses have grown out of the management and sale of tide lands in this State. . . . Now, as I understand this section, it is intended to prevent that sort of thing; to prevent the Legislature from violating the Act of Congress under which California was admitted into the Union. It is intended to comply with the Act of Congress upon which we were admitted into the Union—that these navigable waters should remain open and free. Now, we do not know that the filling up of the harbors, or any portion of them, may result in. Engineers have told us that the filling in of the Bay of San Francisco has endangered the harbor of San Francisco, by forming bars and by deposits. I do not see any objection to the section as it stands. On the contrary, I see a great deal in it that recommends it to the Convention. In regard to the amendment offered by the gentleman from Los Angeles, it excepts San Francisco, and the same deviltry that has been going on in the past may go on in the future.

MR. ESTEE: Can the Legislature control it at all if that is adopted?

MR. HAGER: It does not say that the Legislature shall not authorize wharves to be

let for the purposes of commerce. The Legislature has the exclusive control, and there is nothing in this amendment to prevent it.

MR. EDGERTON: Does the gentleman not know that the filling up of these mud flats and the building of wharves and warehouses where ships may go to load and unload facilitates commerce?

MR. HAGER: The stealing of the mud flats in the City of Oakland was never done for the purpose of commerce at all. It was done for the personal gain of those individuals who have it now, who had it then, and will have it in all time, and as much more as they can possibly get to the exclusion of the general public.

MR. AYERS: Mr. President: This debate has taken a wide and curious range, one that I did not anticipate. Gentlemen have gone so far as even to say that this article, if engrafted upon the Constitution, will interfere with vested rights. How it can have any retroactive effect the gentlemen have not told us, and I cannot see. The gentleman from Marin said, with reference to his land bordering on the bay, that under this article if he had a wharf or bulkhead on his tide lands that he would be compelled to give it up or give free access to it to whoever should ask it. It is not so. The only way in which access can be had over his lands to navigable water, is in the usual way, and for a public use, and in no other way, and that is the principle which underlies this Act. No titles to these lands can be interfered with at all. That rule is laid down in all of the cases, and I refer especially to the case decided by Judge Anderson, in the thirty-second California Reports.[*] Whatever rights may have been acquired by the purchasers of these lands from the State, must have been subservient to the greater rights of the public. This is a matter which has been decided in this State. I will ask the gentleman whether the public policy which has prevailed in this State with reference to the public lands for the last twenty-five years, has been a good one? Whether it has not resulted, or nearly so, in the monopolizing of every frontage upon navigable waters in this State, on the rivers, on the ocean, on the harbors, on the inlets, and on the estuaries. Why, sir, there is hardly a point in this State where wagon, or rail, and ship can meet which is not successfully held and owned by private individuals, and from which the public is excluded. The higher interest of the public has been disregarded, and the lesser interest of individuals and corporations has had full sway. If that has been the case in the past policy of selling in fee these lands to private individuals and corporations, I say, is it not right, is it not wise, for us now to reverse that policy and to withhold these lands from sale? The State will have control of them. Whatever the interests of commerce may require, the State will be unable [sic] to give. I cannot see any force in the objections that have been made on this floor to the article, in whole or in part, and I think it would be a wise policy on the part of this Convention to adopt it with the amendment.

*Sic. The case referred to is *Ward* v. *Mulford* (1867) 32 Cal. 365, Justice Sanderson speaking for the court.