CITY OF ALAMEDA, Plaintiff,

v.

TODD SHIPYARDS CORPORATION and Does I through X, Defendants.

TODD SHIPYARDS CORPORATION, Cross-Complainant,

v.

CITY OF ALAMEDA, United States of America, and Does XI through C, Cross-Defendants.

No. C–85–2789 SC.

United States District Court, N.D. California.

March 20, 1986.

Atwood, Hurst, Knox & Anderson, San Jose, Cal., for Todd Shipyards.

Carter J. Stroud, City Atty., Alameda, Cal., for City of Alameda.

Paul E. Locke, Asst. U.S. Atty., San Francisco, Cal., for U.S.

ORDER DENYING CROSS–MOTIONS FOR SUMMARY JUDGMENT AND DENYING MOTION OF THE UNITED STATES TO BE DISMISSED

CONTI, District Judge.

Plaintiff City of Alameda filed this action against defendant Todd Shipyards Corpora-

tion in Alameda County Superior Court on August 22, 1984. The parties dispute title to 4.9 acres of land in Alameda. Todd Shipyards cross-claimed against the United States of America. On March 27, 1985, the United States of America removed the action to United States District Court for the Northern District of California. This court ordered the City of Alameda to join the State of California as a necessary party defendant under California Public Resources Code Section 6308.

The matter is presently before the court on cross-motions for summary judgment submitted by plaintiff and by defendant Todd Shipyards Corporation, and on a motion to dismiss filed by the United States. If the court were to dismiss the United States, the court would retain diversity jurisdiction, since Todd Shipping is a New York corporation and City of Alameda is deemed a citizen of California for diversity purposes. 28 U.S.C. § 1332; *Helmsley v. City of Detroit*, 205 F.Supp. 793, 794 (E.D. Mich.1962).

This action concerns 4.9 acres of land adjacent to an army air base on the Oakland Estuary in the City of Alameda. The land lay between low tide and high tide in 1850, at the time California became a state. Therefore California gained title to the land in trust for the public. The State of California granted the land to the City of Alameda in 1913, under certain restrictions. The City of Alameda in turn granted the land to the United States in 1931. The United States then purported to sell the land to Todd Shipyards in 1970.

The City of Alameda contends that the conveyance to Todd Shipyards was void, and that the land reverts to the City. Alternatively, the City of Alameda contends that Todd Shipyards holds the land subject to public use restrictions. Todd Shipyards asserts that the land in question was reclaimed from the tides long ago, so that it is not subject to public use restrictions.

The court must consider the series of grants and deeds concerning this parcel in light of the California law governing tidal lands. The court finds that the United

States lacked power to convey the land to Todd Shipyards. The court finds, however, that title does not revert to the City of Alameda. At most, title reverts to the United States. Moreover, Todd Shipyards may seek to estop the City of Alameda from challenging title. Issues remain for trial on estoppel. Finally, the court finds that the land remains subject to public trust restrictions.

**A. FACTS**

The parcel of land in dispute lay within the Oakland estuary in 1850. United States engineers filled much of the land between roughly 1870 and 1913. The Northern edge of the land now borders the Oakland estuary.

The parties disagree over how much of the land is now subject to tidal action. The United States puts forward the declaration of Michael Mahoney, a land surveyor. Mr. Mahoney declares that "the subject land was, for the most part, reclaimed as of 1915. Furthermore, the shoreline of the subject property remains today essentially as it was depicted on the map in 1915." The State of California puts forward the declaration of Rand D. La Force, a land surveyor. Mr. La Force divides the land into three parcels. He declares that 2.1 acres of Parcel 3 are submerged lands, that 0 or 0.2 acres of Parcel 1 are submerged lands, and that Parcel 2 is filled.

It is unclear how the filled portion came to be filled. The State of California claims that United States engineers merely dumped on the subject land sludge dredged from the harbor channel. This filling was not planned. The State has put before the court a letter from the Mayor of Alameda to his Congressman complaining of this action in 1917.

In 1913 the State of California granted to the City of Alameda all the tidelands within the City's boundaries. In 1917 the Legislature of California amended its 1913 grant and authorized the City of Alameda to grant the lands to the United States. In 1930 the citizens of Alameda voted to con-

vey 1100 acres of land to the United States of America for an army air base. Deeds in 1931 and 1932 recited that the City of Alameda conveyed the land to the United States "forever ... for public purposes."

Because of a mistake in the 1931 and 1932 deeds, the City of Alameda neglected to convey to the United States a thin sliver of land bisecting the 1100 acres. The United States obtained a judgment in eminent domain for this portion of land in 1943. Part of the 4.9 acres in question lay within this portion.

The United States did construct an army air base on the 1100 acres. In 1948, additionally, the United States began leasing the 4.9 acres in question to Todd for use as a shipyard. Todd Shipyards leased the parcel continuously until 1970. In 1970, Todd Shipyards purchased the 4.9 acres from the United States for $525,000.

## B. THE PUBLIC TRUST

 When California attained statehood, it acquired title to the State's tidelands as an incident of sovereignty. Tidelands are those lands covered by high tide and uncovered by low tide. Each state holds title to its tidelands "in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties." *Illinois Central Railroad v. Illinois*, 146 U.S. 387, 452, 13 S.Ct. 110, 118, 36 L.Ed. 1018 (1892). The public trust in tidelands restricts the circumstances in which a state may convey the lands to a private party. *Id.* Even after private conveyance, the public retains the right to use the land for navigation, commerce and fishing. Thus any owner of tidelands holds them subject to public use restrictions. These restrictions vary in degree from state to state. *See generally,* Note, "The Public Trust in Tidal Areas," 79 Yale L.J. 762 (1970).

A long series of cases affirms the public trust in tidelands in California. In addition, Article X, Sections 3 and 4 of the California Constitution, adopted in 1879,

buttress the trust restrictions. Section 3 provides: "All tidelands within two miles of any incorporated city ... shall be withheld from grant or sale to private persons, partnerships, or corporations...." Section 4 provides: "No individual, partnership, or corporation, claiming or possessing the frontage or tidal lands of a harbor, bay, inlet, estuary, or other navigable water in this State, shall be permitted to exclude the right of way to such water whenever it is required for any public purpose, nor to destroy or obstruct the free navigation of such water...."

## C. ALIENATION

### 1. *Public Trust Doctrine Bars Alienation To A Private Person Absent Special Action By The Legislature*

The California Constitution plainly bars the state and its cities from conveying tidelands to private persons. Nonetheless, California cases beginning with *People v. California Fish Co.*, 166 Cal. 576, 138 P. 79 (1913) have allowed the state to alienate tidelands to private persons in certain limited circumstances. These cases allow the state to determine that in some instances private ownership will better serve development.

In *California Fish*, for example, the legislature had authorized state boards to fill in the land now bordering San Francisco harbor, and to sell these lands to private persons. *California Fish* upheld these sales.

> ... in the administration of this trust when the plan or system of improvement of development adopted by the state for the promotion of navigation and commerce cuts off a part of these tide lands or submerged lands from the public channels, so that they are no longer useful for navigation, the state may thereupon sell and dispose of such excluded lands into private ownership or private uses, thereby destroying the public easement in such portion of the lands and giving them over to the grantee, free from public control and use.

The power of the legislature to alien trust lands is limited, however, and the California courts have struck down improper legislative action. *See, e.g., County of Orange v. Heim,* 30 Cal.App.3d 694, 106 Cal. Rptr. 825 (1973).

Most importantly, only the legislature may authorize the sale of trust lands to a private person under *California Fish.* In the present case, the legislature and state boards have taken no action to authorize private sale. The state has not set up a system of development that cuts off the subject lands from public navigation, and the state has made no finding that the lands have lost their public value. Absent such action, Article X, Section 3 of the California constitution clearly bars private sale. The state's grant to the City of Alameda made this clear.

### 2. The United States Did Not Acquire The Right To Convey The Land To A Private Person

■ The granting statute and deeds in this case make clear that the United States did not acquire the right to convey the land to a private person.

In 1913 the State of California granted the City of Alameda title to all tidelands within its borders. In the granting statute, the State gave its full interest to the City, subject to several conditions. Among these conditions, the statute forbade the City from alienating the land to a private party. The statute also reserved the State's right to use wharves and other improvements, and reserved the people's right to fish.

In 1917 the State amended the statute. The amended grant allowed Alameda to convey its tidelands to the United States. It retained the prohibition against sale to a private owner. The amended statutory grant reads as follows:

> There is hereby granted to the city of Alameda, a municipal corporation of the State of California, and to its successors, all the right, title and interest of the State of California, held by said state by virtue of its sovereignty, in and to all the salt marsh, tide and submerged lands, whether filled or unfilled, within the present boundaries of said city ... to be forever held by said city, and by its successors, in trust for the uses and purposes, and upon the express conditions following, to wit:
>
> ... *said city, or its successors, shall not, except as herein authorized, at any time, grant, convey, give or alien said lands, or any part thereof, to any individual, firm or corporation for any purpose whatever....*
>
> [the city or its successors may lease the land for certain purposes for a period not to exceed twenty-five years]
>
> ... provided, however, that the said city of Alameda may grant, give, convey and alien such lands or any portion thereof, forever to the United States for public purposes of the United States....

(emphasis added) The United States is the successor in interest to the City of Alameda. The italicized clause bars both the City and the United States from conveying the land to a private person. The City of Alameda did not acquire from the state the right to sell the land to a private person, and hence the City could not in turn convey this right to the United States.

### D. THE LAND DOES NOT REVERT TO THE CITY

Because the United States lacked power to convey the land to Todd Shipyards, the purported conveyance of 1970 is void. Thus legal title reverts to the United States. The City of Alameda has established no basis for its claim that the land reverts to the City.

California's grant to the City of Alameda provided that Alameda could convey the land to the United States "forever". It did not require that Alameda grant a defeasible estate.

In 1930 the voters of Alameda approved a proposition to convey the 1100 acres to the United States "forever" for use as an army base. The proposition named two conditions. It required that the United States accept the land for use as an army

base by a certain date, and it required that the United States appropriate at least $500,000 for development of the land. The proposition did not require that the United States *always* use the land as an army base. Deeds of 1930 and 1931 incorporated the provisions of the voter proposition. The concluding paragraph of the 1931 deed made reference to the two conditions of the voter proposition:

> TO HAVE AND TO HOLD, all and singular the said lands together with the appurtenances and privileges thereto incident, unto said Party of the Second Part, forever for public purposes, subject to the terms and conditions as aforesaid.

Neither the voter proposition nor the deeds contained any provision that the land could revert to the City after the two initial conditions had been met.

The United States satisfied the two initial conditions. It wrote to the City of Alameda requesting a quitclaim deed. In 1935 the City Council authorized the Mayor to issue a quitclaim deed. No quitclaim deed is recorded. Nonetheless, the Council Resolution makes clear the City's intent. Since the United States had satisfied the two conditions of the voter proposition, the United States now possessed Alameda's full interest in the land. This was a fee simple subject to the trust restrictions. There was no provision that the land might revert to the City or the State if the United States violated the trust restrictions.

■ The clause quoted from the deed expressly referred to the two initial conditions. Thus the phrase "for public purposes" does not establish a further condition subsequent. The parties did not intend that the land would revert to the City of Alameda if the United States ceased to use the land "for public purposes." At most, this phrase declared the purpose for which the City of Alameda expected the land would be used. *See, e.g., Fitzgerald v. County of Modoc,* 164 Cal. 493, 495, 129 P. 794 (1913); *Springmeyer v. City of South Tahoe,* 132 Cal.App.3d 375, 380–81, 183 Cal.Rptr. 43 (1982). "[T]he mere recital in the deed of the purpose for which the land conveyed was to be used is not in itself sufficient to impose any limitation or restriction on the estate granted." *Selectmen of the Town of Nahant v. United States,* 293 F.Supp. 1076 (D.Mass.1968). *Accord, Lethin v. United States,* 583 F.Supp. 863, 871 (D.Ore.1984).

■ The City of Alameda asserts an implied condition that the land would revert to the City if the United States attempted to sell the land in violation of the trust restrictions. The court will not add an implied condition absent a showing that this is what the parties intended. "A fee simple title is presumed to be intended to pass by a grant of real property, unless it appears from the grant that a lesser estate was intended." Cal.Civil Code § 1105.

The State cites *Boston Waterfront Development Corp. v. Commonwealth,* 378 Mass. 629, 393 N.E.2d 356 (1979) to support an implied condition of reversion. The citation is not apt. Massachusetts law differs greatly from California law on tidelands. Massachusetts law expressly allows a grant of tidelands to a private party, so long as the private owner's use is in keeping with the trust purposes. In *Boston Waterfront* the Massachusetts court found an implied condition that a private party can hold tidelands only for publicly useful purposes. As applied here, then, the rule in *Boston Waterfront* would create a question of fact whether Todd Shipyards's use serves the public interest in use of the waters. It would not challenge Todd Shipyards's ownership.

■ Finally, the Statute of Limitations bars the City of Alameda and the State of California from suing to enforce a reversion. The City brought this action fourteen years after Todd Shipyards purchased the property, and the State then joined in the action. California Code of Civil Procedure Section 315 sets a ten year limit on an action by the State to claim a right to real property. Section 316 sets the same limit for an action by the City as grantee from the state. Thus neither the City nor the State can sue to claim a right to the land

by reversion. The statute of limitations does not bar Alameda's suit to invalidate the sale for violation of the trust, but the statute does bar Alameda's suit to reclaim title.

## E. TODD SHIPYARDS MAY ARGUE ESTOPPEL AT TRIAL

█ In part C of this opinion the court determined that the United States did not have the power to convey title to Todd Shipyards. The United States purported to sell the land to Todd Shipyards in 1970. Fourteen years later, the City of Alameda filed suit to challenge Todd Shipyards's title. Todd Shipyards asserts that Alameda knew of the sale in 1970 and did not object to the sale. Todd Shipyards asserts that it made improvements on the land in reliance on its title. Todd Shipyards may argue that Alameda is estopped from challenging title.

There is precedent in California case law to estop a city from challenging invalid title to tidelands. In *City of Long Beach v. Mansell*, 3 Cal.3d 462, 467, 91 Cal.Rptr. 23, 476 P.2d 423 (1970), the City of Long Beach had acquiesced in the filling of tidelands, and had plotted streets along the fill. The City of Long Beach knew that title was doubtful. The court held, in a complicated scenario, that the City and State were estopped from challenging the title they had long tolerated.

█ Estoppel may apply against the government where it would not violate significant public policy and where justice so requires. *City of Long Beach v. Mansell*, 3 Cal.3d at 493, 91 Cal.Rptr. 23, 476 P.2d 423. Although the California Constitution announces a policy against privatization of tidelands, that policy will not bar an estoppel defence here, since in many other instances the California courts have upheld acts of the legislature conveying tidelands to private owners.

The court in *Long Beach* enumerated the elements of estoppel as follows:

> ... (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted

upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.

3 Cal.3d at 489, 91 Cal.Rptr. 23, 476 P.2d 423, *quoting Driscoll v. City of Los Angeles*, 67 Cal.2d 297, 305, 61 Cal.Rptr. 661, 431 P.2d 245 (1967). In the present scenario, Todd Shipyards may be able to show these elements.

The court states the following issues for trial: (1) Did the City and the State have notice that the United States conveyed the land to Todd Shipyards in 1970 by sale (instead of lease)? (2) Did the City and the State intend Todd Shipyards to believe they acquiesced in the sale? If not, did they act so that it was reasonable for Todd Shipyards to believe they acquiesced in the sale? (3) Was Todd Shipyards ignorant that the United States lacked power to sell the land? (4) Did Todd Shipyards rely to its detriment—by paying taxes, by making improvements on the land, or otherwise—on the City's and the State's acquiescence?

These issues remain for trial. Therefore the court denies the cross-motions for summary judgment. The parties remain free to raise additional issues at trial or in further motions. The court does not decide issues of standing at this time.

## F. RESTRICTED USE

█ California Constitution Article X, Section 4 amplifies the common law restrictions on the use of tidelands. Tidelands granted to a municipality are generally acquired subject to the public trust. *Mallon v. City of Long Beach*, 44 Cal.2d 199, 209, 282 P.2d 481 (1955). In the present instance, the legislature granted the lands to Alameda "in trust". Thus the legislature clearly intended that public trust restrictions would remain. The City did not then have the power to remove the trust restrictions merely by conveying the land to the United States, and the United States did not have the power to remove the trust

restrictions merely by conveying the land to Todd Shipyards.

Todd Shipyards argues that the land has been filled, so that it is no longer tidelands and is not subject to the trust restrictions. California case law rejects this argument. The court in *California Fish* held that the legislature could remove lands from the tidal trust only in limited circumstances.

> ... in the administration of this trust when the plan or system of improvement or development adopted by the state for the promotion of navigation and commerce cuts off a part of these tide lands or submerged lands from the public channels, so that they are no longer useful for navigation, the state may thereupon sell and dispose of such excluded lands into private ownership or private uses, thereby destroying the public easement in such portion of the lands and giving them over to the grantee, free from public control and use.

166 Cal. at 585–86, 138 P. 79. In the present case, the state has made no plan of improvement including the subject land, and the state has not disposed of the land into private use.

■■■ The California courts have expressly held that filling the land alone does not ease the trust restrictions. In *City of Long Beach v. Mansell* dredging and filling had reclaimed large areas of former tidelands. Residential and recreational areas rested on this fill. Nonetheless, the court held that the land remained "tidelands".

> ... it would be contrary to the spirit and purpose of [the constitutional prohibition against alienation] to conclude that the word 'tidelands' ... denotes only those public lands which retain the physical characteristics of tidelands at the time of proposed alienation, for such a construction would permit parties to remove public tidelands from the reach of the constitutional provision by simply filling so that such lands were no longer covered and uncovered by the flow and ebb of the tide.

*City of Long Beach v. Mansell,* 3 Cal.3d 462, 479, 91 Cal.Rptr. 23, 476 P.2d 423 (1970). Private parties may not remove lands from the trust merely by filling. *City of Long Beach* squarely holds that lands subject to the action of the tides at the time of the Constitutional provisions remain tidelands for purposes of the restriction even after they are filled.

In *Atwood v. Hammond,* 4 Cal.2d 31, 48 P.2d 20 (1935) the state had authorized the city to fill tidelands as part of harbor development. The state then issued a grant declaring that the tract had ceased to be tidelands and freeing it from the trust. *Atwood* held that this was permissible under the common law trust and under the constitution. *City of Long Beach* affirmed *Atwood* and emphasized that only the state can free tidelands from the public trust.

> ... we emphasize that the circumstances under which this may occur are of necessity unique, that the conditions sanctioning its approval must be scrupulously observed and satisfied, and that generally speaking the reclaimed area alleged to be free from both the public trust and the constitutional restriction against alienation into private ownership must be, as it were, a residual product of the larger program ... determined by the Legislature to have no further value for the purposes of the public easement.

The state has taken no such action here. Thus *Atwood* and *City of Long Beach* require that the land remain subject to the public trust.

*City of Berkeley v. Superior Court,* 26 Cal.3d 515, 162 Cal.Rptr. 327, 606 P.2d 362 (1980) represents only a limited departure from this rule. In that case the state Board of Tide Land Commissioners had granted land to private parties under a statute of 1870. In 1915 the California Supreme Court had ruled that these private owners held their land free of the public trust. *City of Berkeley* overruled the earlier decision. It held that in general the state could not sell tidelands free of the public trust. The court recognized, however, that it would be unfair to take from

property owners interests they had acquired in reliance on the earlier decision. The court balanced the public interest in tidelands against the fair expectations of the owners. The court resolved that parcels of land still subject to tidal action would retain the public trust restrictions, while parcels that had been filled would no longer be subject to the public trust.

*City of Berkeley* emphasized that this compromise applied only to the lands then before the court. The court left standing the rule that filling alone does not terminate the trust. 26 Cal.3d at 535, n. 19, 162 Cal.Rptr. 327, 606 P.2d 362. In the present case, Todd Shipyards relies upon the following factors: (1) filling was substantially completed before the first conveyance of the subject lands; and (2) Todd Shipyards did not know of the restrictions when it purchased. These two factors are not sufficient to oust the trust restrictions.

The sliver of land the United States acquired by condemnation also carried with it public trust obligations. *See, e.g., United States v. 1.58 Acres of Land, etc.,* 523 F.Supp. 120, 124 (D.Mass.1981). Article X of the California Constitution establishes a trust in the land. Even if the land was filled at the time of the condemnation action, the United States still could acquire only the interest of its predecessors in title, the City and the State. Since the State and the City both held the land subject to the public trust, the United States could take the land only subject to the public trust.

## G. THE UNITED STATES SHOULD NOT BE DISMISSED

██ The United States moves the court to dismiss it from this action. Todd Shipyards acquired title from the United States by a quitclaim deed. Todd Shipyards therefore can have no claim against the United States for breaching any warranty of title. *Hagan v. Gardner,* 283 F.2d 643, 646 (9th Cir.1960). Nonetheless, the United States has an interest in the land. Its conveyance of title to Todd Shipyards was invalid. Therefore title will revert to the United States unless Todd Shipyards proves an estoppel defence. Since the United States does have an interest in the property, it should not be dismissed.

## H. RESOLUTION OF THE ISSUES

In its order of January 24, 1986, the court directed the parties to address the several issues that govern this action. The court resolves these issues as follows.

a. Tidelands may be alienated from public ownership only by special action of the legislature conveying them for a public purpose. *California Fish.*

b. The City of Alameda held a restricted fee. It did not have the right to alienate the land to a private party. The City had the power to convey to the United States only this same restricted fee.

c. The City conveyed to the United States a fee subject to public trust restrictions. The United States was obligated to hold the land in trust for navigation and public use.

(i) The United States violated its trust obligation in purporting to convey the land to Todd Shipyards. However, the land does not revert to the City for that reason.

d. When it acquired a strip of the land by condemnation, the United States acquired the condemned lands subject to public trust obligations. The United States was obligated not to alienate these lands into private ownership.

(i) The United States violated these obligations when it purported to transfer a portion of that property to Todd Shipyards.

e. The City of Alameda has not claimed any interest in the land Todd Shipyards refers to as "Parcel P".

f. The tidelands were filled in part sometime before their transfer from the City to the United States. Mere filling does not remove the public trust obligations, however. To remove the trust obligations requires a special act of the legislature. None of the land has been reclaimed by such a special act.

g. The United States did not have power to reclaim the land so as to remove it from the public trust.

h. Todd Shipyards may have a defense of estoppel. Factual questions remain for trial. (See Part E.)

In accordance with the foregoing, it is hereby ordered that:

(1) the motion of the City of Alameda for summary judgment is denied;

(2) the motion of Todd Shipyards for summary judgment is denied;

(3) the motion of the United States to be dismissed from this lawsuit is denied; and

(4) status conference and trial setting is continued to 10:00 a.m. on April 11, 1986. Each party shall file a brief supplemental status report by April 7, 1986 indicating its plans for further motions and for trial in light of this order.