Filed 2/6/14  In re E.G. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re E.G., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY, <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> IRVING R., <br><br>     Defendant and Appellant. | A138048 <br><br> (Alameda County Super. Ct. No. OJ10015595) |

Appellant Irving R. (Father) is the biological father of E.G., who was determined to be a dependent child as a result of Father's physical and emotional abuse of E.G. and her mother (Mother), as well as Mother's neglect of the child.  Father was granted reunification services by the court, but was never recognized as a presumed father.  While Father complied with his case plan and significantly improved his relationship with E.G., the court found that he did not play a parental role in the child's life and terminated his parental rights.  Father appeals.  Respondent Alameda County Social Services Agency (Agency) argues that, as a biological father only, he lacks standing to challenge the termination order.  Father argues that the Agency is estopped from contesting his status. We disagree.  We in any event find no merit to his substantive objections to the court's order.

1

# I. BACKGROUND

*Jurisdiction*

In September 2010, the Agency filed a juvenile dependency petition on behalf of then 11-month-old E.G. As finally amended and sustained by the court as true, the petition cited several incidents of domestic violence and child abuse:

"On 4/24/2010, the father held the minor by the ankles and swung her towards the mother and the mother caught the minor. The father then tried to either grab or hit the mother, which resulted in the minor getting two scratches on her forehead and cheek. The father threw the minor onto the bed with the mother and urinated on both the minor and the mother. The father dragged the minor by her ankles and threw her in the bushes when the [father] kicked the mother out[,] telling the mother to take the minor with her."[1]

"On 04/27/2010, the father 'beat' the mother with a belt, his fists and other objects resulting in the mother having cuts and bruises on her back, wrist and legs. The father also threw the minor on a bed and urinated on both the mother and the minor. The father also threatened the mother with a hammer and knife when she told him that she no longer wanted to be in a relationship with him. The father then grabbed the minor by the ankles and dragged her outside and threw her in the bushes telling the mother to take the minor with her."

"In or about May 18, 2010, the mother obtained a Restraining Order[2] but the mother has allowed the father back in the home . . . ."

"On or about August 18, 2010, the father kicked the mother in the minor's presence."

The petition also alleged that Mother was developmentally delayed and mildly mentally retarded and that both parents had a history of drug use. The sustained

---

[1] It was raining heavily that night and, because Father took Mother's cell phone, mother had to walk across town with E.G. in the rain to her home.

[2] A five-year restraining order that was issued on June 18, 2010, required Father to stay away from Mother and E.G. and did not allow for visitation between Father and E.G.

jurisdictional allegations became final when the parents failed to appeal from the disposition order and are not subject to attack in this appeal.

E.G. was not detained when the original petition was filed, but was detained about one week later, in early October 2010, after Mother left her in the care of roommates with few provisions and did not return or respond to calls or messages. Mother later admitted that she used drugs while she was away from E.G. Father claimed Mother engaged in prostitution. Mother reported that Father had come to her apartment and taken her work clothes and E.G.'s birth certificate, Medi-Cal card, and electronic benefit transfer card, but Father denied taking these items. Mother also reported that Father sent her a text reading, "Bitch you got my daughter taken away, die," and that he threatened to "come and get her" after the restraining order expired.

In November 2010, E.G. was formally removed from Mother's care and placed with her godmother (Godmother), a friend of Mother. Mother was granted reunification services.

*Paternity Testing, Visitation and Reunification Services*

Following a positive paternity test, and at the Agency's request, the court declared Father E.G.'s biological father in December 2010 and granted him reunification services. Before formal services started, Father was taking anger management classes for a work-related incident and he voluntarily enrolled in parenting classes as well. He asked for custody of E.G., but he lacked stable housing. In its October 2010 report, the Agency wrote, "[Father] appears to care for the minor and wants what's best for her but he needs to work on his anger issues and parenting skills to ensure that the minor would be safe at all times when in his custody. [Father] lacks maturity and could benefit from therapy to enhance his relationship skill[s]." According to the Agency's April 2011 status review report, Father had a criminal record—seven misdemeanor convictions, 17 failures to appear in court, and 15 revocations of probation—and he was consistently testing positive for marijuana. He also continued to violate the restraining order by having unsupervised contact with E.G. and Mother. In April 2011, Mother reported that she was two months pregnant and believed Father was the father.

From November 2010 to April 2011, the social worker supervised weekly visitation between E.G. and Father. "[E.G.] sometimes appears to be cautious when interacting with her father and sometimes appears to be anxious, confused or uncomfortable with her father. [E.G.] normally cries or protests when her father picks her up. [E.G.] is sometimes very quiet when first interacting with her father and will sit quietly and not smile." Because of the Agency's concern about these visits, therapeutic visits supervised by a psychologist were arranged and began in about April 2011.

A June 2011 report on the therapeutic visits between Father and E.G. explained that the "goals of treatment have been to help [E.G.] reduce her anxiety around transitioning into the visits with her father and to increase her ability to verbalize her feelings and seek out a primary caregiver for comfort and soothing when she is upset. . . . [¶] . . . From my observations during the visits, . . . [E.G.] has displayed a range of emotions and behavior in relation to her father. She has periods of quickly warming up to her father, displaying laughing, talking and mutual interactions and the start of symbolic play, which is what we would expect for her age. [¶] [She] also has periods where she is more disorganized when she arrives and has a harder time transitioning from caregiver to visits with her father. During these times, [E.G.] can cry for long periods of time, avoid eye contact, and display[] a stiff body posture, sometimes clinging to her father and other times refusing to be picked up by him. . . . [She] frequently will continue to display some watchfulness or clinging behavior, along with distractibility and restlessness throughout the rest of the visit." In June 2011, the court ordered continued services.

*Termination of Services*

In a September 2011 report, the Agency recommended termination of services for both parents. A September 12, 2011 update on the therapeutic visits[3] stated, "[A]lthough [E.G.] has shown much improvement in her relationship with her father and in her

_____

[3] In July 2011, the restraining order was modified to allow therapeutic visits between Father and E.G.

4

developmental abilities, she continues to present as quieter than would be expected and with less language than typical for her age.  In order for [E.G.] to heal from her past trauma and to develop skills and behaviors that would be typical for her age she would need to have a strong attachment relationship with a primary caregiver.  This means someone she feels comfortable seeking out when she is scared or anxious."  The psychologist questioned whether E.G. had such a relationship with Godmother, but clearly implied that E.G. did not have such a relationship with Father.  While Father had gained insight into his relationship with E.G. and had improved his ability to read E.G.'s cues during visits, at times he would "become preoccupied by his own feelings of grief or sadness," causing E.G. to engage in self-protective role reversal by comforting Father.

The social worker opined that E.G. could not safely be placed in Father's care because Father "lack[ed] insight into the effects the domestic violence may have had on [E.G.]. . . . The father's domestic violence instructor says that the father has made progress in addressing his anger and history of domestic violence but also admits that progress is slow for the father and the father needs to continue to attend his class and complete the entire 52 week program.  The parents deny that they have been in contact with each other . . . [but a]t the same time the parents both state they would like to get back together someday to live as a family."[4]  Nevertheless, the social worker observed that "the parents love [E.G.] and hopefully they will be able to maintain a relationship with her as both parents currently appear to have a cordial relationship with [Godmother]."

Contested status review hearings took place in February, March, April, and May 2012.  In the meantime, the Agency filed additional reports.

In January 2012, the Agency reported that Father had finished 37 weeks of the 52-week domestic violence class, had completed his outpatient drug treatment program, and had tested negative on all of his drug tests with one exception for alcohol.  He also

---

[4] Mother gave birth to another daughter in November 2011.  Both parents continued to believe Father was the new baby's father.

5

continued to participate in individual therapy and attend therapeutic visits with E.G. "The father's relationship with [E.G.] has now improved and she now appears to enjoy the time she spends with him." The social worker wrote that E.G. appeared to have developed a parental relationship with Godmother.

By March 2012, Father and E.G. had made further progress in therapeutic visits: "[E.G.] has continued to show developmental progress in her sessions with her father. . . . [¶] Within the last three months, [E.G.] has displayed a reduction in her watchful behavior and a broader affect. . . . She is also displaying . . . limit testing . . . . [H]er newly expressed protest, broader affect, and the developmental improvements she is displaying are good signs of increased comfort. . . . [¶] [Father] continues to show improvement in his ability to follow [E.G.'s] lead in play and read her cues. He continues to be open to interventions and psychoeducation . . . . [H]e has incorporated into his knowledge the importance of routine and consistency for [E.G.] Further, [he] has shown an ability to empathize with [E.G.'s] experience and to delight in her joys and allow her protests. . . . [¶] . . . [¶] . . . [However,] I . . . continue to have concerns about the impact of the reported domestic violence and physical abuse on [E.G.] Further, there continues to be times when [Father] becomes preoccupied by his own needs or feelings and is not able to read [E.G.'s] cues of protest or bids for attention. He continues to display many instances of parent-directed play or being triggered and can miss [E.G.'s] cues or bids for interaction at these times. . . . [Although] I continue to see [Father] taking responsibility and considering the impact that his actions have had most specifically on his daughter[,] . . . he does not discuss any specific details related to his past actions."

In April 2012, the Agency wrote that, while Father continued to seek custody of E.G., he only had a studio apartment and struggled to pay rent each month. The social worker continued to opine that the parents lacked insight into the effects domestic violence may have had on E.G. "The father's domestic violence instructor reports that the father has been a consistent participant in his class . . . [but the instructor] has also been unwilling to discuss specific aspects of [Father's] progress related to his own history of Domestic Violence." Father admitted that he had relapsed into using alcohol, and had

6

been arrested for driving under the influence on February 2, 2012. As a result, he had been required to re-enter a treatment program.

In May 2012, the Agency reported that Father had disclosed that he had contact with Mother periodically during January and February 2012, in violation of the restraining order. On one of those occasions, Father became angry because he suspected Mother of using drugs, and he destroyed a radio he had given Mother as a gift.

On May 15, 2012, the court terminated the parents' reunification services and set a Welfare and Institutions Code section 366.26[5] hearing for August. Because Father did not challenge that order by writ petition, the order is final and cannot be directly or collaterally challenged in this appeal. (§ 366.26, subd. (*l*).)

*Section 366.26 Proceedings and Bonding Study*

At the April 2012 contested hearing on termination of services, the court ordered a bonding study. In the August 6, 2012 section 366.26 report, the Agency described the purpose of the study as follows:[6] "[G]iven the unusual circumstances of [F]ather's progress in therapeutic visitation, and the limited knowledge of the child's relationship with [Godmother], [the court decided] it would be most valuable to have an evaluation that considers the relationship of the child in both parental relationships." Since the study had not begun by the August hearing, the court ordered a 90-day continuance so the study could be prepared and granted another 90-day continuance in November. In the meantime, the Agency filed additional reports.

In August 2012, the Agency reported that Father's relationship with E.G. had improved significantly and E.G. now referred to him as "my Daddy." Beginning in August, therapeutic visits were replaced by joint therapy for Father and E.G., followed by a visit. In October, an additional hour of weekly visitation was added. In November, the Agency reported that E.G. "is much more relaxed with her father and seeks out his

---

[5] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[6] The appellate record does not include reporters' transcripts of the contested hearings on termination of services.

attention constantly. [She] is playful and affectionate with her father and goes to him for comfort when needed. Her father is responsive to [her] and follows her lead. He is appropriate, affectionate and loving towards her. The father also continues to participate in . . . [a] relapse prevention program, test negative for the use of drugs and alcohol, and participate in weekly individual therapy."

In February 2013, the Agency wrote that E.G. continued to have difficulty with transitions at the beginning and end of the visits, especially when Godmother provided transportation. "After [E.G.] recovers, she begins to interact and engage with her father and appears to enjoy these interactions. For the remainder of the visit, [she] is talkative and demonstrates a wide range of affect. . . . [¶] . . . [¶] At the end of the visit, [E.G.] occasionally becomes somber again. . . . On the way home, [she] asks [the social worker] questions about her father such as 'Where's my daddy going?' or 'Is this Daddy's house?' [¶] . . . [Father] has reflected with insight on the changes he has been able to make in his life while participating in individual therapy and substance abuse recovery services, and in his visits and therapy with [E.G.]." Godmother said she wanted E.G. to have ongoing, regular contact with her birth parents.

The bonding study, conducted by a licensed psychologist, was filed in February 2013. The psychologist concluded that E.G. did not exhibit "secure base behavior" with Father that a child typically would exhibit with a primary attachment figure. "[E.G.] appeared to be stressed/worried, tense and her affect became increasingly confused and disorganized. It appears that she does not experience [Father] as a source of comfort, soothing, or protection. [¶] . . . [¶] . . . [T]his is not an attachment relationship." The psychologist had a limited opportunity to observe E.G. with Godmother and concluded, in contrast, that when E.G. was with Godmother she "was calm, focused on quiet play activities and demonstrated what appeared to be secure base behavior. She demonstrated a clear response to separation during the exchange between [the Godmother and Father] in our office [when she clung to Godmother]. She showed a greater range of affect when she was with [Godmother] and did not demonstrate confused/confusing affective reactions." Further, the psychologist reported that Father's

comments during a parenting interview "focused more on expectations for [E.G.'s] performance rather than on her emotional wellbeing or needs for a sense of safety," whereas Godmother could describe "the ways her children see things differently from her" and "could make connections between [E.G.'s] actions/behaviors . . . and . . . possible feeling states that [E.G.] might be experiencing."

"In summary," the psychologist wrote, "1) the evidence shows that [E.G.] differentiates these two relationships and the evidence is that she considers [Godmother] her attachment figure or psychological parent. 2) [E.G.'s] functional competences are vulnerable to stress, suggesting that she needs the emotional scaffolding and co-regulation of a trusted caregiver in times of uncertainty, distress or threat. Thus, . . . stability is going to matter a lot[.] 3) . . . [E.G.] is demonstrating significant symptoms of an anxiety disorder. [E.G.'s] best interests and her emotional well-being will be best served by continuity in her current living situation, continuity in relationship to her attachment figure, and reduction or elimination of uncertainty extant in the impermanence that accompanies her current status." While Father had established himself as a person "who does have meaning to [E.G.,] . . . [h]e might be viewed similarly to a regular babysitter or childcare provider."

Continuing visitation with Father to see if an attachment relationship developed between him and E.G. "would be detrimental to [E.G.] . . . [because it] would continue the uncertainty. . . . [E.G.] is developing increased awareness . . . of the contrasts between her and [Godmother's] other children, that they do not go to 'visits'; she is increasingly able to anticipate and worry about the separations as her sense of time matures. At worst, [continued visits] would be destructive because [E.G.] would have separation and loss imposed on her, . . . and her developmental progress could be even more significantly derailed."

An update on the therapeutic visits reached similar conclusions. "[E.G.] presents with marked symptoms of anxiety, which may be attributed to previous trauma, separation, as well as the uncertainty in permanence associated with prolonged Child Welfare involvement. [Father] has demonstrated perseverance and effort . . . . There has

been considerable progress within the parent-child relationship given the limited opportunity they have together. Nevertheless, under the current circumstances and with given time constraints, [E.G.] and her father have not had the opportunity to build a primary attachment relationship. . . . [¶] It is crucial to note that . . . [E.G.'s] current relationships [(e.g., with Godmother)], if they are functioning as attachments in a supportive way, should not be disrupted as that would cause mental health damage. [¶] . . . [¶] In conclusion, given her symptoms, a resolution to the question of [E.G.'s] placement is urgent."

At the section 366.26 hearing, Father cited comments in the bonding study and the report on therapeutic visitation that E.G. would benefit from a continuing relationship with him, and he asked the court to adopt a permanent plan of legal guardianship rather than adoption. "[G]iven . . . the caregiver's lack of being consistent with the visits, [Father's] concern is[] . . . that he'll be shut out of [E.G.'s] life altogether . . . ." The court acknowledged that Father had been "stellar" in his consistency with visitation, "more than just about any father I can think of over the last three years now or so," but also noted the severity of the abuse that brought E.G. into court dependency in the first place. The court adopted the Agency's recommendation to terminate parental rights.

## II. DISCUSSION

Father challenges the juvenile court's ruling, arguing that the beneficial parental relationship exception to termination of parental rights applied in this case.

A. *Standing*

The Agency argues Father lacks standing to challenge the termination of his parental rights. It argues that, as a matter of law, biological fathers who have not established presumed father status lack standing to challenge the termination of their parental rights. The Agency correctly notes that a mere biological father (i.e., a biological father who has not established presumed father status) has only limited rights to notice of the proceedings and an opportunity to establish presumed father status. (*In re Joseph G.* (2000) 83 Cal.App.4th 712, 715.) A biological or alleged father who has received an opportunity to establish presumed father status and has not done so ordinarily

cannot challenge the juvenile court's decision to terminate parental rights. (*In re Joseph G.*, at pp. 715–716 [alleged father who had notice of proceedings and did not appear or seek presumed father status lacked standing to appeal termination of parental rights]; cf. *In re Baby Boy V.* (2006) 140 Cal.App.4th 1108, 1116–1117 [alleged father has standing to appeal order terminating his paternal rights on the ground he was never provided an opportunity to establish presumed father status].) The Agency argues that "[s]tanding to appeal is jurisdictional" (*In re Harmony B.* (2005) 125 Cal.App.4th 831, 837), and that we must dismiss the appeal if we find Father lacks standing.

Here, upon establishing paternity, Father was declared the biological father and granted reunification services. (See § 361.5, subd. (a) [court may order services for the child and biological father if it determines services will benefit the child].) Nothing in the record indicates that Father ever asked to be elevated to presumed father status or that the court ever did so. Father was identified as "alleged father" or "father" in minute orders of court hearings; as "father" in the Agency's reports during the reunification period, and as "father (biological)" in the Agency's section 366.26 report and subsequent reports, never as "presumed father."

Father argues in his reply brief that the Agency should be equitably estopped from challenging his standing.[7] "Whenever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it." (Evid. Code, § 623; *City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 488–489.)

Father cites evidence that might support his argument. As a mere biological father, Father lacked standing to challenge the jurisdiction and disposition orders in the

---

[7] In his opening brief, Father largely ignores the issue and simply identifies himself as "father of the minor" without differentiating his status. Only in a footnote, without any reasoned discussion, does Father even suggest that he is a presumed father, contending that it is "unclear from the record" when his status was elevated, but that he was "considered" a presumed father by the time of the section 366.26 hearing.

juvenile court. (See *In re Alyssa F.* (2003) 112 Cal.App.4th 846, 855 ["[a]n alleged father is entitled to notice so that he may change his paternity status, but he has no standing to challenge other orders"]; *In re Karla C.* (2003) 113 Cal.App.4th 166, 172, 179–180 [implying alleged father lacked standing to participate in jurisdiction and disposition hearing].) However, insofar as the appellate record discloses,[8] the Agency raised no objection when Father (along with Mother) contested those orders and actively participated in the contested hearing by presenting evidence. Similarly, the Agency raised no objection when Father (again along with Mother) contested termination of services and presented evidence at the contested hearings, despite a lack of standing to do so. Most strikingly, the Agency apparently raised no objection to the order for a bonding study to evaluate Father's relationship with E.G., even though the result of such a study was legally irrelevant to the termination of parental rights of a biological father. (See *In re Christopher M.* (2003) 113 Cal.App.4th 155, 160 [alleged father had no standing to participate in section 366.26 hearing].) Finally, the Agency did not object to Father's participation in the section 366.26 hearing itself. Because Father was receiving all of the services and procedural rights he would have been entitled to as a presumed father (including appointed counsel), and because the Agency made no objection to his full participation in the dependency case, he arguably was led to believe by the Agency's conduct that the Agency would not object to his exercise of those same rights on appeal and thus justifiably failed to perfect his presumed father status in the juvenile court. Father also correctly notes that the court referred to him as "the presumed father" when it issued its oral ruling at the section 366.26 hearing, although the minute order of the hearing stated that "Parental rights of . . . Alleged Father (Irving [R.]) are hereby terminated."

Father argues, in essence, that we should consider the entirety of the record and award him presumed father status for purposes of this appeal. But Father's equitable

---

[8] The appellate record does not include reporters' transcripts of hearings before August 2012.

12

estoppel argument raises fact issues that were not argued or resolved in the juvenile court, and Father cites no case in which a father has been able to achieve a parental status on appeal that he never sought or achieved in the trial court.

Father was represented by counsel and should have been well aware of the need to obtain presumed father status to ensure his ability to contest termination of his parental rights. Father cannot reasonably argue that the court's isolated reference to him as a "presumed father" at the section 366.26 hearing led him to believe his status was elevated in the absence of any formalities. The juvenile court was authorized to grant services to the biological father in its discretion, and to allow Father to participate in hearings touching on those services as a result, without recognizing Father as a presumed father. Further, Father has not established that he declined to seek presumed father status *in reliance on* the Agency's stance, and the Agency notes that the language used by Father's attorney at the section 366.26 hearing—requesting rather than asserting a right to the beneficial parent relationship exception to termination of parental rights—might reflect a deliberate decision not to pursue the issue. Moreover, because Father never obtained unsupervised visitation, much less custody of E.G., it is unclear whether he could have achieved presumed father status had he even pursued it. We agree with the Agency that Father lacks standing to challenge the court's order.

Even if we were to assume that Father could somehow establish de facto standing, we would in any event affirm the juvenile court's order.

B.      *Beneficial Parental Relationship Exception to Termination of Parental Rights*

At a section 366.26 hearing, the juvenile must determine by clear and convincing evidence whether it is likely the dependent minor will be adopted. (§ 366.26, subd. (c)(1).) If the court finds a likelihood of adoption, the court must terminate parental rights and order the child placed for adoption unless, as applicable here, it finds a "compelling reason" that termination would be detrimental under one of the exceptions listed in section 366.26 subdivision (c)(1)(B). A party arguing that one of those exceptions applies has the burden of producing evidence that establishes the exception.

13

(*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343 [discussing former § 366.26, subd. (c)(1), predecessor of § 366.26, subd. (c)(1)(B)].)

Under the beneficial parental relationship exception, the court must find a "compelling reason" that termination of parental rights would be detrimental because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "The existence of interaction between the natural parent and child will always confer some incidental benefit to the child." (*In re Lorenzo C., supra,* 54 Cal.App.4th at p. 1342.) The beneficial parental relationship exception requires more, "that the parent-child relationship promote the well-being of the child to such a degree that it outweighs the well-being the child would gain in a permanent home with new, adoptive parents. [Citation.]" (*Ibid.*) A juvenile court's decision on application of the beneficial parental relationship exception is reviewed either for substantial evidence or for abuse of discretion; in this context, there is little difference between these standards of review. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351–1352.)

The juvenile court's decision here is amply supported by the record. While Father showed sustained commitment toward E.G. during the reunification period and significantly improved his relationship with her, he never established a parental relationship with her. The bonding study reported that E.G. continued to show anxiety around him under circumstances of stress and did not turn to him for comfort or otherwise treat him as an attachment figure. The latest report on therapeutic visitation, which was based on a much longer period of observation and sustained therapeutic engagement with Father, reached the same conclusion. The finding is unsurprising given the historical facts of the case, which include Father's physical abuse of E.G. and physical and emotional abuse of Mother and his contribution to instability in E.G.'s early life. Moreover, both reports found that E.G. was a particularly emotionally fragile child who urgently needed stability. While the juvenile court appropriately commended Father for the progress he made during the dependency case, the critical issue at the

14

section 366.26 hearing was E.G.'s then current need for permanence and stability, taking into account her actual attachments to adult figures in her life. The bonding study specifically advised that it would be more harmful to E.G. to delay permanence in order to maintain her relationship with Father than it would be to free her for adoption at the risk of her cutting her off from Father. Father had established himself as a person "who does have meaning to [E.G.]," but his relationship was only similar "to a regular babysitter or childcare provider." Father had not established such an important parental relationship that maintenance of the relationship outweighed E.G.'s need for the permanence of adoption by Godmother, her primary attachment figure. The court's ruling is affirmed.

## III.   DISPOSITION

The order terminating parental rights is affirmed.

15

_____
Bruiniers, J.


We concur:


_____
Jones, P. J.


_____
Needham, J.